## McANDREWS v. THATCHER.

The liability of a cargo to contribute, in general average, in favor of the ship, does not continue after the cargo has been completely separated from the vessel, so as to leave no community of interest remaining.
This principle illustrated in the following case:
A ship was stranded near her port of destination, and the underwriters upon her *cargo* sent an agent to assist the master in getting her off. The master and agent made all proper *efforts to do this*, for two days; when not succeeding at all, and the water increasing in the vessel, they began to discharge the cargo in lighters, still making efforts to save the ship. This discharge of the cargo occupied four days; by which time the whole of it was taken off, and, with the exception of a very small fraction in the lower hold and not discovered, taken to the ship's agents, who subsequently delivered it to its consignees, they giving the usual

average bond. By the time that the cargo was thus all got off, the vessel, not assisted by being lightened, was settling in the sand, with the tide ebbing and flowing through her as she lay. The agent considering her case hopeless, and the consignees of the ship having refused to authorize him to incur any further expense, now went away.

On the next morning, and while the master was yet aboard, the underwriters on the *vessel* sent *their* agent, who got to work to float the vessel. Soon after the new agent came, the crew refused to do duty. The agent got new hands, and the crew went away. They were soon followed by the master, he leaving the vessel after the new agent had been in charge of her for four days. After six weeks' labor, and an expenditure of money somewhat exceeding her value when saved, the new agent succeeded in floating and rescuing the ship. The remnants of the cargo, in a damaged state, were delivered to its consignees.

On a suit by the owners of the ship against the consignees of the cargo, for contribution in general average for the expenses incurred after the master went away—

*Held,* that the case was not one for contribution; there having been, as the court considered, no community of interest remaining between the ship and cargo, after the master, in the circumstances of the case, had left the ship.

THE ship Rachel, owned by Thatcher and others, of Boston, sailed from Liverpool for New York in July, 1859, with a cargo, consisting, among other things, of four hundred and four boxes of liquorice paste, consigned to McAndrews, in New York. The vessel, with her cargo, arrived in safety inside of Sandy Hook on the 21st of September; but, in coming up the bay, struck in a gale on the west bank, in the lower harbor, and became fast.

Regarding the ship and cargo as in peril, the master accepted the services of a steamer which that same day came alongside, to get her off. This steamer passed her hawser on board, and made fast; but, finding that her power was not sufficient to accomplish the object, she set a signal for another steam-tug. Another immediately came to her aid. The power of both combined was tried, but they could not start the ship from the place where she lay imbedded in the sand. These steamers continued their efforts for several hours. During this time a third steamer came alongside and made fast to the ship; but in her endeavor to start it parted her hawser, and all came to the conclusion that their efforts were fruit

less.  The master, at six o'clock the same afternoon, left the ship and went to the port for advice and assistance; but the mate and mariners remained on board.  At four o'clock on the following morning it appeared that there was fourteen and a half feet of water in the ship, and that this was fast increasing.  The cargo was insured in New York and the ship in Boston.  The underwriters of the *cargo*, with the knowledge and consent of the consignees of the ship, during the forenoon of the second day after the disaster, sent a steamer and their agent, a certain Captain Merrit, to the ship, for the purpose of saving, if possible, both it and the cargo.  The steamer had a schooner in tow, and every necessary appliance—such as steam-pumps and wrecking apparatus—to rescue the ship, or, if necessary, to discharge the cargo.  These continued their efforts, under the direction of the master, who had returned to his ship, for two days; but, finding that they were unable to get the ship off, they got to work to *discharge the cargo into lighters, and transport it to its place of destination.*  The discharge of the cargo occupied four days, *i. e.* till the 26th of September; during which time three hundred and ninety-one boxes of the liquorice paste were taken off.

The cargo so discharged and transported was placed in the custody of the *agents of the ship, who, upon receiving the usual average bond, delivered the same to the consignees.*  Efforts to get the ship off were continued by these parties until the said twenty-sixth of September, when the steam-pumps were taken down and carried away, having finished discharging the cargo.  Before the agent left the vessel finally he went to New York and consulted with the consignees of the ship.  These refused to authorize him to incur any further expense; the ship at that time, as positive testimony declared, having been settling in the sand, with the tide ebbing and flowing in her as she lay.

Intelligence of the disasters having reached the underwriters of the *ship*, they sent *their* agent, one Captain Morris, to the vessel.  He went on board at one o'clock the next morning, after the other agent went away, and took charge

of her; but the crew soon afterwards came aft and refused to do duty. Deprived of their services, he went immediately to New York and employed other men to supply their places, and the crew left the ship. The next two days were spent in procuring oil casks, and in attempts to buoy the ship by their use, but without any beneficial result, except to save some of the materials of the vessel. It was found, on the next morning (that of the 30th), after a storm, that the ship, at her hatches, had eighteen feet of water, and as the sea was breaking over her, and she was apparently going to pieces, her main topmast was, by order of Morris, cut away.

The master, unable to do more than he had done, now abandoned the ship, and left her where she lay, in charge of Morris, the agent of her underwriters. Not discouraged by her condition, Morris continued his endeavors until the 11th of November following; and on that day, by the assistance of two steamers, *succeeded in getting her free,* and towed her up to the Marine Railway, at Hunter's Point, for repairs. The value of the ship as saved was somewhat less than the expense of getting her off after Morris came on board. Examination made at the Marine Railway showed that there were remnants of the cargo, in a damaged state,* including eleven boxes of the liquorice paste, not till then discovered, on board. These were discharged and delivered to the consignees.†

The ship-owners sued the consignees of the liquorice paste in the Circuit Court for the Southern District of New York, for $3363.89, adjusted as in the note for their ratable pro-

---

* One box had been lost overboard in discharging the cargo.

† The whole expenses on the saving of vessel and cargo were, $13,772 07

| | |
|---|---:|
| The expenses, after Morris came on board, | 6,884 76 |
| The ship as saved was valued at | 6,758 00 |
| The cargo (including sales of damaged), $24,600 and $298.34, | 31,754 66 |
| The freight earned was | 978 06 |
| The sales of the whole of the defendants' consignment of 350 and 54 cases of liquorice was | 11,747 28 |
| Of that delivered from the ship after she got off, deducting charges, | 132 50 |
| The contribution of their consignment to the whole expense as adjusted, | 3,363 89 |

portion of the expenses incurred in saving the ship after Morris came on board. The court below was of opinion that the claim was well founded in law, and charged accordingly.

Its opinion expresses so well one view which may be taken of the case that the reader will gain by having it entire :

"This is, perhaps, a close case, but we are inclined to think that, on principle, the cargo of the defendants is bound to contribute in general average to the expenses of saving the vessel. The fact that the vessel stranded near the port of destination has somewhat embarrassed the case, taken in connection with the circumstances attending the delivery of the cargo by lighters. It is open to the observation that the cargo was not only separated from the vessel and the common impending peril, before most of the expenses in relieving the latter were incurred, but that the separation took place at the instance and expense of the consignees of the cargo. This view, however, to the extent stated, is not sustained by the evidence. The cargo was discharged into the lighters to relieve the vessel; and the delivery then at the port of destination is attributable to the accident of the proximity of the port. The cargo was at the risk and responsibility of the ship until delivered by her consignees on receiving bond for average contribution.

"It is true, in a literal sense, that after the discharge of the cargo upon the lighters, and separation from the ship, the safety of the cargo no longer depended upon the saving of the vessel; and hence that there was no longer any common peril impending or benefit derived from the expenses incurred. But is this true in a more general view of the facts of the case, or in contemplation of law? By the accident which occasioned the stranding of the vessel, both the vessel and cargo were exposed to one common danger, and the expenses incurred were incurred with a view to the safety of both, and of course for their common benefit. Steam-tugs were employed, and efforts made to start the vessel from her sand bed—steam-pumps and wrecking apparatus used. These efforts failing, then commenced sending down yards and spars, and placing cargo into lighters. All these were expenses incurred, and efforts made by the master, who represented the interests of all concerned. These efforts were

continued by the master until and after he was joined by Captain Morris, the agent sent by the underwriters of the ship, who then took charge of the business.

"The question, under these circumstances, is this, Was the cargo exempt from all expenses incurred in relieving the ship after it was placed in safety upon the lighters? We agree that, if the consignees of the cargo had accepted it thus delivered, at the sides of the stranded ship, the separation would have been complete, and it would have been no longer connected with the danger or its incidents. But this cannot be pretended. The cargo continued as a part of the adventure not yet terminated. It cannot be doubted but if any damage had happened to it in the transfer to the lighters, or in the conveyance to the port, the loss would have been the subject of general average, and the ship liable for its share. And in this sense the cargo is still interested in the safety of the ship. It is said the consignees of the cargo do not claim any average contribution. But their release or waiver cannot affect the question. The test is, is the vessel legally liable?

"There is certainly a difficulty in laying down any general rule by which to determine the measure of expense the master or owner, in case of a vessel stranded by a peril of the sea, may incur, and to which the cargo saved must contribute. That expenses may be incurred, indeed that it is oftentimes the duty of the masters or owner to incur them, is not to be denied. We do not see but the measure of them must depend upon the exercise of sound judgment and good faith, under all the circumstances of the case. No fixed amount can be settled in advance. There may be abuses, as in every case where the rule of liability turns upon the exercise of the human judgment in the given case. The only remedy we know of consists in the supervision of the courts. We cannot say, in this case, that the owner should have ceased his efforts when the cargo was saved, or that he forfeited his right to the contribution by the continuance of them."

The jury having found in favor of the plaintiff for the $3363.89 claimed, and judgment having gone accordingly, the case was now here on exceptions and error.

*Mr. Alexander Hamilton, Jr., for the plaintiffs in error:*

1. The general rule will not be disputed that expenditures are not to be brought into general average, unless they are of an extraordinary character, and incurred for the *joint* benefit of ship and cargo.

In this case the cargo had been stored in safety at its place of destination before the expenses to save the ship, for which this action is brought, or any part of them, had been incurred.

Certainly when Captain Morris took charge of the ship, at the request of, and as agent for, the Boston underwriters on the ship, the cargo had been discharged into lighters by other parties, and safely stored at its place of destination, and the freight earned, or was due thereon. No further service was to be rendered to the cargo by the carrier, nor had he any further connection with it, save his lien for freight and charges. It was no longer at risk, and the separation from the ship was complete and absolute.

All expenses thereafter incurred upon the ship were made with a view to its preservation alone, and could not possibly benefit the cargo, or affect the freight in any way.

Of the three interests, therefore, two—cargo and freight—were no longer at risk, but, on the contrary, were absolutely secured, and entirely independent of the ship, whatever might be its fate. The ship itself was an absolute loss; the expenses of saving exceeding its value when saved.

Though the general principles which we here assert are well settled in mercantile law and practice, the adjudicated cases upon them are not numerous.

In England the first case affecting the question is *Sheppard* v. *Wright*, reported in Shower's Parliamentary Cases.* There a ship, laden with silk and oils, from Messina to London, was chased to Malaga by the French fleet. The factor of the *owners of the ship* sent a lighter to save what he could of the ship's cargo, and because the silks were of the greatest value, they were put on board of a lighter, with a small por-

---

* Page 18.

tion of the oil, and carried on shore.  At night the French left the port, when the master ceased to land any more cargo. Some few days after the fleet again appeared, and the French got the ship and the remaining cargo.  The silks were afterwards put on board another ship, and delivered to their owners in London.  The action was brought by the owners of the ship and oils against the owners of the silks, to have contribution for their loss, but the bill was dismissed by the chancellor, which was affirmed upon appeal by the House of Lords.  This was in 1693.

In the case of *Job* v. *Langton*,* the ship, with a cargo from Liverpool, ran on shore accidentally on the coast of Ireland. In order to get her off it became necessary to discharge the whole of her cargo, which was taken out and placed in store in Dublin.  The ship was got off by digging a channel and employing a steam-tug.  The cargo was shipped in another vessel and forwarded to its destination; but, for the purposes of the case, it was to be considered as having been carried on by the original ship after she had been repaired.  The question was, were the expenses incurred after the cargo was in safety, in getting off the ship and towing her to Liverpool for repairs, chargeable in general average, or to the ship alone?  Lord Campbell (all the court agreeing with him) held they were chargeable to the ship alone.

Connecting this case with that of *Moran* v. *Jones*,† subsequently decided in the same court, it will be seen that it was put upon the ground that the expenses claimed were incurred under an agreement made subsequently to the saving of the cargo, and were not part of a continuous series of measures for the safety of the cargo and ship jointly.  The case at bar is like it.  No objection is made by us to any part of the expenses incurred in removing the cargo and materials, down to the time that the cargo was safely landed and the ship practically abandoned by her consignees.  The objection goes to the expenses incurred under Captain Mor-

---

* 6 Ellis & Blackburne (88 English Common Law), 779.
† 7 Id. (90 English Common Law), 532.

ris's administration, after he was employed by the under-
writers on the ship, twenty-four hours after the abandonment.

In *Job* v. *Langton* another fact appeared, to which the
notice of the court is requested. The cargo in that case was
of coal; and, when it was discharged, a very small part of
it, to wit, fifty tons, were left on board the ship to "stiffen
her." In this case a small remnant of cargo, bearing the
proportion of one hundred and forty-fourth part of the whole,
was also left on board, to be removed because it could not
be got at; although, when Captain Morris went on board,
he supposed there was no cargo in the ship, and acted upon
that idea.

2. The stranding was involuntary, and, as a *cause* of loss
or expense, did not give rise to a claim for contribution in
general average.

3. The stranding occurred in entering the port of destina-
tion. In such cases expenses incurred in raising the ship
are not general average.*

As the vessel, after the cargo was taken out, did not float,
and was in fact a total loss—the expense of floating her
exceeding her value when raised—it is clear, under the
authorities, that these expenses cannot be brought into con-
tribution in general average. †

*Mr. Daniel Lord and Mr. George D. Lord, contra, for the
ship-owners.*

1. The ship and cargo, when stranded, were jointly ex-
posed to a common and imminent danger of loss. Nor
was the danger less common or less imminent because the
stranding was near the end of the voyage. That it was *in*-
voluntary did but make the peril the greater. Neither fact
impaired the right to contribution.

The community of extraordinary peril commenced with
the stranding, and did not terminate until the arrival of the

---

* 2 Arnould on Insurance, § 325, p. 889, Boston ed., 1849; Stevens on
Average, 22

† Stevens & Benecke, Phillips's edition, 139–40; Marshall *v.* Garner, 6
Barbour, 394; 2 Phillips on Insurance, 3d ed., 117.

vessel and cargo at the place of safe delivery. The connection of vessel and cargo, as to common service, did not end before.

2. The whole saving, with its attendant expenses, was one continuous, unremitted operation, both in theory and in point of fact, from its beginning until the ship with the remnant of cargo reached the Marine Railway at New York. Although the effort was taken in hand finally by those who were *substitutes* for the original master and crew, yet the last, as the former, represented the owners of the ship, and in the line of their duty were acting as such representatives.

The vessel and cargo continued in the joint possession of the owners of the ship and their agents, and the cargo was not received from them until the various parts of the cargo had all arrived and been delivered at the end of the voyage; and had been received on the orders of the owners' agents, and subject jointly to a claim of general average. The consignment of defendants was not received or saved by them, separately or severally, or through any separate act of their own. It also was protected by a right of contribution in case of loss, while proceeding in the saving vessels from the shoal to the place of delivery in the city of New York. Indeed, a part of the defendants' consignment remained in the ship to the last, and was received by them from the ship's agents, at the city of New York, and sold by the defendants. Had this been of great value, it would not have been exempted from its contribution. But until actually delivered and sold, its value could not be ascertained. And, moreover, its value could not vary the principle of the liability, but merely the amount of its assessment. The defendants stand in the same condition as if all their consignment had been retained by the ship's agents, until received under a common bond of united responsibility.

3. It is contrary to the principle of general average to relieve any of the parts of the common adventure from its ratable share of contribution, by reason of its delivery being made successively, when made by the endeavors commenced and continued in common. The labor and expen-

diture of rescuing the part of an adventure first relieved, is chargeable on the residue of the cargo, and on the ship; because the latter are thereby relieved of part of the danger. The goods taken into lighters, on the relieving of the ship, are still at the risk of the ship and cargo, which their unlading or jettison first relieves. But as the ship and residue of the cargo are thus chargeable with a burden, they are equally entitled to relief and contributions from the cargo whose safety is promoted by it. Supposing the value of the ship and the freight in peril large, and that of the cargo small, if the cargo is relieved by common expenditures falling largely on the ship, the ship thus contributes largely for the saving of the cargo; the equity is the same, if the values are reversed and the cargo is made to bear more, according to its just proportion.

Adjudged cases support our view. *Bevan* v. *Bank of the United States*,* in the Supreme Court of Pennsylvania, may almost be said to be in point. The reporter's syllabus of the case runs thus:

"A vessel bound to Philadelphia, and having a large sum of specie on board belonging to the defendants, arrived in the bay of the Delaware, in the month of December, and after encountering various difficulties was stranded and ice-bound, near Reedy Island, in a situation of imminent peril. The specie was carried over the ice to the shore, and by land to Philadelphia, where it was delivered to the defendants. Some weeks afterwards the vessel reached Philadelphia in safety with the remainder of the cargo, which had been in whole or in part discharged into lighters, and afterwards reshipped. *Held,* that the defendants were liable to contribute to the charges and expenses incurred after the landing of the specie, as general average."

As in some degree illustrating the subject, we may next refer to *Bedford Commercial Insurance Co.* v. *Parker et al.,* in the Supreme Court of Massachusetts.† In that case, a ship insured was accidentally stranded within a few miles of her

---

* 4 Wharton, 301.                    † 2 Pickering, 1.

port of destination. A., the owner of the cargo, which consisted of iron, saved part of it at his own expense. The insurers afterwards sent men on board, who endeavored without success to get the ship off, and at the same time the men employed by A. saved forty tons more of the iron. The two parties of men acted separately, though sometimes assisting each other. After this the insurers contracted to pay B. $2600, if he would get the ship off; and A. agreed that they might offer B. $600 for saving the iron, provided the ship should not be saved. B. got the ship off, and brought her to the wharf with 155 tons of iron on board. It was *held*, that the 155 tons were liable to contribute in general average to the $2600, though the rest of the iron was not.

*Nelson* v. *Belmont*, in New York,[*] is, perhaps, more in point. The following is an extract from the syllabus, which presents the *case as adjudged.* Some general observations in the opinion—*dicta* merely—need not be referred to, since they cannot operate in a counter way.

" The cargo of a vessel being on fire, the master transferred a quantity of specie to another ship, which by his request convoyed him into a port of distress. He there incurred expenses in putting out the fire and repairing damages to the vessel, the specie being meantime deposited in a bank. The damages were found to be such that the cargo was sold and the voyage abandoned. *Held*, that the specie was liable in general average for the expenses at the port of distress."

The counsel of the other side have referred to and commented upon *Moran* v. *Jones*, and have endeavored, perhaps, to explain it away. Here, again, we present the syllabus of the case, or its material parts. It seems to sustain our view.

" A ship was chartered to proceed from Liverpool to a foreign port. She took on board an outward cargo, and sailed. She was driven on a bank, by a storm, near Liverpool; and the cargo was rescued from her and carried to Liverpool, and there warehoused, the ship still remaining ashore in a situation of

---

[*] 21 New York, 36.

peril. Some days afterwards the ship was got off and taken to Liverpool, where she was repaired, and again took the cargo on board and proceeded on her voyage.

" The question for the court was, whether the expenses, incurred after the goods were in Liverpool in getting the ship off, without which she could not have proceeded on her voyage or earned the chartered freight, were general average to which ship, freight, and cargo were to contribute; or were chargeable to ship alone; or were chargeable on any other principle.

" The court drew the inference of fact, that the whole saving of the cargo and ship was one continued transaction; and on that hypothesis *held*, that the expenses were general average to which ship, freight, and cargo must contribute."

*Reply:* One position of the other side is, that a portion of the cargo was still on board, and, therefore, the separation was not completely made between ship and cargo.

An answer to this is, that the portion remaining was a mere damaged remnant under water, abandoned as not worth saving, and amounting only in value, to about $\frac{1}{144}$th part of the whole. Such a remnant—nothing to speak of—comes within the rule "*de minimis*," and cannot be allowed to drag after it into contribution the cargo saved as an entirety. To allow that would be refining too much. If such a remnant could be made use of to controvert the fact of the separation between ship and cargo, then no such separation would ever practically be made, for it is in the highest degree improbable where a vessel takes the bottom and is strained and injured by striking and rolling so as to lose her keel, and open her seams, that every particle of an assorted cargo shall be fully taken out of her.

Another and apparently better position of the other side is, that the efforts and expenditures to save the ship formed part of a continuous series of measures for the common benefit, and should, therefore, be justly brought into contribution with other expenditures incurred, and that all these expenses were defrayed by the parties to whom the master of the ship, as agent of all concerned, had consigned the vessel in the absence of her owners.

But the case shows that so far from there being a " con-tinuous series of measures" to save, there were two distinct sets of efforts, by different parties, and different interests; the first being for the benefit of all; the second for one interest alone, undertaken when it appeared to be, and was, in fact, a desperate enterprise, leading to a waste of money.

*As respects the authorities cited by my brothers Lord:* The whole matter in the case at bar consists more in the application of a principle to facts not disputed than in anything else. To understand therefore how far the cases cited apply, it is necessary to state them more fully than the opposite counsel have done.

*Bevan* v. *The Bank of the United States,* is the first and the strongest case they have. There the plaintiffs were the owners of a ship which arrived in Delaware Bay in December, 1831, from New Orleans for Philadelphia, and became stranded in a situation of imminent peril. It was necessary to remove her cargo as in case of wreck. Among the first articles landed was a sum of specie belonging to the defendants. It was received on the ice in sleds, and immediately conveyed to the shore, on the morning of the 16th of December, 1831. It was then sent to Philadelphia, and on the following day delivered to the defendants. Eight weeks after, the vessel arrived in Philadelphia with the remainder of her cargo, which had been in whole or in part discharged into lighters and afterwards reshipped.

During the period of eight weeks a large number of additional charges had been incurred for the safety of the vessel *and the remainder of the cargo.*

In this case the question was, whether the expenses incurred in getting the ship into port after the specie had been sent forward should be brought into general average, including the specie, and it was held that they should.

The only ground upon which an argument can be made to sustain this decision is, that the same series of measures taken by the captain to save his ship and cargo continued to be taken by him up to the time that his ship and cargo

arrived in Philadelphia. In the case before the court no such fact exists.

Mr. Phillips, in his work on Insurance,* questions this decision, and shows that the passage in Benecke, the authority on which the case of Bevan mainly relies, is not analogous to the case in question, and that the case of the specie " does not," to use his language, " seem to be distinguishable from that of a part of the cargo being landed after arrival at the port of destination, and a subsequent general average loss on the ship and remainder of the cargo still on board, to which the part delivered would unquestionably not be liable to contribute; the remainder of the cargo, in the case in question, not having been delivered to the consignees, but landed and reloaded on the ship, being afloat again, continued to be within the ordinary category of contributory interest." So too the Court of Appeals of New York, in *Nelson* v. *Belmont*, discusses the opinion in the case, and doubts whether it can be sustained upon either of the grounds upon which it is put. For the purposes of this case, however, it is sufficient to say, that in its important facts it is so different, that it is not an authority to sustain the position of the defendant in error here.

The next case referred to, on the opposite side, is *Bedford Commercial Insurance Co.* v. *Parker*. In that case, the ship was on her voyage from a foreign port to New Bedford, and struck on a reef outside the harbor, about nine miles from the town. Shortly after she struck, the defendants, who were owners of *ship and cargo*, offered to abandon her to the plaintiffs, who were the underwriters. These refused to accept, but determined to save the ship if they could, the defendants agreeing that nothing done by the plaintiff with that object should prejudice them on the question of the defendants' right to abandon. Men were sent to the vessel by the plaintiffs to save what they could of the sails and rigging, and some of the iron of which the cargo consisted was taken out by them and carried to New Bedford. A

---

* Vol. 2, § 1407: see also 1 Parsons on Maritime Law, 326.

large quantity of iron was saved, also, by men employed at the expense of the defendants. Considerable quantities of iron were taken out of the hold, and some of the men employed by the plaintiffs aided by pumping and otherwise to save the cargo; but during the time the defendants had men on board who were employed by them at their expense in getting out the iron. Forty tons of iron were taken from the ship and were brought to New Bedford by a sloop in the employment of the plaintiffs, but the defendants had vessels there, ready to have taken it. The labor and difficulty in saving it was in getting it from the ship's hold, and this was done by the defendants' men. After this, the directors of the company authorized two of their number to offer $2000 as a compensation to any one who would undertake to get the ship off, the contractor to be paid nothing unless he should succeed, and with the consent of Parker, one of the defendants, the agents were to offer $600, provided the iron should be all taken out, and the vessel should not be removed; and so in a certain proportion for so much iron as should be taken out.

The agents contracted with one Delano, engaging to pay him $2600 if the vessel and the whole cargo should be made secure, but no express stipulation was made relative to the iron separately. It was understood, however, that the contractors were to be paid in proportion to what might be saved, to the extent of $600. They got the vessel off and brought her safely into the harbor, having about 155 tons of iron still on board. The ship was also repaired by the defendants, the parties to the policy having agreed that the insurer should pay $1750 for repairs necessary upon the ship.

It was also in evidence, that when the plaintiffs settled their accounts with the laborers, who also assisted in saving the iron, they refused to pay those men who were engaged by the defendants. These parties of men acted separately, though sometimes assisting each other.

The question was, what part of the cargo, if any, should contribute to the expenses of raising the ship, and the court

held that only that part of the cargo that was in her when she was raised should contribute to the expenses of raising her.

This case is, in fact, an authority against the plaintiff in error. It is parallel with that now before the court, except that in the case in Massachusetts, the ship and cargo were owned by the same persons, who separated to some extent from the underwriters, in their efforts to save their several interests;—while in this case the owners of the cargo and ship being different persons, acted in concert down to the time that the underwriters on the ship took sole possession of her.

In *Nelson* v. *Belmont,* the next case referred to, the Galena sailed from New Orleans for Havre with a cargo of cotton and $30,853 in specie belonging to the defendant. On July 23, 1853, the vessel was struck by lightning in the Gulf Stream, and was found to be on fire in the hold. After attempting to extinguish it, a Danish vessel came in sight, and the passengers and their baggage were transferred to her. On the following day an arrangement was made with the Danish captain by which he was to take the specie on board his vessel and accompany the Galena to Charleston. This was done because he had the passengers on board and as a protection to the crew in case they had to leave the Galena. The specie was transferred because if the fire broke out it might be too late to remove it from the Galena. Both vessels reached Charleston. Engines of the city poured water into the Galena till she filled and sank to the upper deck. The cotton absorbed a good deal of water, very little of it having been previously injured, and the captain determined to abandon the voyage. He sold the cargo there and remitted the proceeds. While in the harbor and before reaching the wharf, he got the specie from the Danish vessel and deposited it in the bank. The question was whether the specie was liable to contribute in general average to the amount paid for the services of the Danish brig, the expenses at Charleston of sinking and raising the vessel, the repairs, and damage to the cotton by water, &c.

In delivering the opinion of the court, Selden, J., says :*

" My conclusion is, notwithstanding the case of *Bevan* v. *United States Bank*, that if the owner of any portion of the cargo, even after a peril has occurred, and after a series of measures to avert it has commenced, can succeed in so separating his own property from the rest that it is no longer in any case at risk, he cannot be held liable to contribute to the expenses subsequently incurred."

After some remarks upon the term " at risk," he goes on to indicate where the line of distinction lies :

" If the voyage is not abandoned, and the property, though separated from the rest and removed from the ship, is *still under the control of the master and liable to be taken again on board, for the purpose of being carried to its destined port,* the relations of the several owners are in no respect changed."

These expressions show what would have been the decision in a case like the present one. They are not *dicta*, either; but expressions which show the general view of the court on the point here in issue. On precedent and on principle, therefore, we think the case (even if a " close" one) is with us. On the English cases, we have already remarked.

Mr. Justice CLIFFORD delivered the opinion of the court.†

Views of the defendants are, that the case, as stated, is not a case for contribution in general average, and that the court erred in instructing the jury that the plaintiffs were entitled to recover.

Primary proposition maintained by the defendants is, that expenses incurred in a voyage, although they were necessary and proper, are not to be carried into general average unless they were of an extraordinary character, nor unless it appears that they were incurred for the joint benefit of the ship and cargo; and that inasmuch as it appears in this case that the cargo had been stored in safety, at the place of destination, before the expenses, for which the suit was com-

* Page 42. † Field, J., not having sat.

menced, were incurred, the claim of the plaintiffs cannot be sustained.

Decision and judgment in the case must depend upon the question, whether the several sums expended by the agent of the underwriters of the ship, after he went on board and took charge of the vessel and the men and means employed to save her, were properly carried into the adjustment; because it is plain that if those sums are not properly included in the expenses of general average the judgment should be reversed.

I. Sacrifices, voluntarily made in the course of the voyage, of part of the ship or cargo, to save the residue of the adventure from an impending peril, or extraordinary expenses incurred for the joint benefit of both ship and cargo, and which became necessary in consequence of a common peril, are usually regarded as the proper subjects of general average.

All losses which give a claim to general average contribution, says a standard writer upon the law of insurance, may be divided into two great classes:

1. Those which arise from sacrifices of part of the ship or part of the cargo, purposely made in order to save the whole adventure from perishing.

2. Those which arise out of extraordinary expenses incurred for the joint benefit of both ship and cargo.*

Present case, if the defendants are liable at all, falls within the latter class, and, consequently, it will not be necessary to remark upon the former class, although cases of jettison are much more frequently presented for decision than cases growing out of the stranding of the vessel. Stranding in this case was involuntary; but it cannot be doubted that the ship and cargo were jointly exposed to a common peril, and were in imminent danger of being wholly lost. Such being the fact, it is clear that the expenses of saving the ship and cargo were a proper subject of joint and ratable contribution in general average by vessel, freight, and cargo, provided the vessel and cargo were saved by the same series of mea-

---

* 2 Arnould on Insurance, 881.

sures during the continuance of the common peril which created the joint necessity for the expenses.*

Undoubtedly, the community of extraordinary peril commenced with the stranding of the vessel; but the question is, where it terminated? Three theories may be suggested:

1. That it terminated when the cargo was separated from the ship, and was transported to the port of destination and delivered to the consignee.

2. That it terminated when the master, acting in good faith as the agent of all concerned, yielded to the necessities of his situation and abandoned the endeavors to save the ship, and left her where she was stranded, in charge of the agent of her underwriters.

3. That it did not terminate until the ship was got off from the bank where she was stranded, and arrived at the marine railway for repairs in her port of destination.

Theory of defendants is substantially expressed in the first proposition; but the plaintiffs insist that the community of peril did not terminate until the arrival of the vessel at the port of destination; and if not, then the charge of the court was correct, and the judgment of the court must be affirmed.

Natural justice requires that where two or more parties are in a common sea risk, and one of them makes a sacrifice or incurs extraordinary expenses for the general safety, the loss or expenses so incurred shall be assessed upon all in proportion to the share of each in the adventure; or, in other words, the owners of the other shares are bound to make contribution in the proportion of the value of their several interests.†

Courts universally admit that the Rhodian law was the parent of maritime contribution, although, in terms, it made no provision for any case of general average, except for that of jettison of goods as the means of lightening the vessel. But the rule, as there laid down, has never been understood as being confined to that particular case, but has always

---

* Benecke & Stevens on Average, 96; Baily on Average, 45, 71; Birkley *v.* Presgrave, 1 East, 220; Addison on Contracts, 490.

† 2 Phillips on Insurance, 65; Holt on Shipping, 482.

been regarded as a general regulation, applicable in all cases falling within the principle on which it is founded.

Principle of the rule is, that " what is given for the general benefit of all, shall be made good by the contribution of all;" and hence it is that losses, which arise out of extraordinary expenses incurred for the joint benefit of ship and cargo, are as clearly to be carried into the adjustment as those which arise from sacrifices of part of the ship or part of the cargo.

Settled rule, also, is, that when a vessel is accidentally stranded in the course of her voyage, and by labor and expense she is set afloat, and completes her voyage with the cargo on board, the expense incurred for that object, as it produced benefit to all, so it shall be a charge upon all, according to the rates apportioning general average.*

In case of accidental stranding, says Mr. Phillips, the expenses incurred for getting off the vessel, as far as they are incurred for the purpose of saving the ship, cargo, and freight, and are common to all those interests, are a subject of contribution by all.   Expenses, however incurred for any separate interest, he says, are wholly chargeable to that interest, and there can be no doubt that the proposition, as stated, is correct as a general rule, and yet it is apparent that there will often be difficulties in its application.  Foreseeing those difficulties, the same author attempts to obviate them by three practical illustrations, which it becomes important to notice:

1. That if the ship is got off without discharging the cargo, or by discharging only a part of it, then the whole expense is general average, unless the vessel needs repairs; but if she needs repairs, those are particular average.

2. That if the vessel does not float when the whole cargo is discharged, the subsequent expenses do not concern the cargo, but are particular average on the vessel in the same manner as repairs.

---

* Bedford Commercial Insurance Company v. Parker, 2 Pickering, 7; Benecke & Stevens on Average, 139.

3. That goods, when landed from a stranded ship, and delivered to the consignee, cease to be liable to contribute for expenses subsequently incurred.

Unquestionably, the rule enunciated in the first illustration is correct; but grave doubts are entertained whether the second and third can be admitted *in all cases* without important qualifications.

Although the stranded vessel may not float, as a consequence of the unlading of the goods, still she may be so lightened by the operation, that the usual appliances at hand may be amply sufficient to enable the master to rescue the vessel without much expense or delay, and put her in a condition to receive back the cargo and transport it to the port of destination; and, in the case supposed, it cannot be doubted that the expense of saving the vessel, as well as the expense of preserving and reloading the cargo, would be the proper subject of general contribution.

So, where the cargo consists of various consignments, and the vessel is stranded in the harbor of the port of destination, it will seldom or never happen that all the consignments will be delivered at the same time. On the contrary, some of necessity will be delivered before others; and yet, if the unlading of the cargo has the effect to make the vessel float, and the whole adventure is saved by one continued, unremitted operation, under the directions of the master, as the agent of all concerned, it would seem that the case was one falling directly within the equitable principle of general average, which requires that all the interests shall contribute for the expenses incurred to save the whole adventure from common peril.*

Unless the rule is so, a new statement of the adjustment would be necessary upon each respective part of the cargo delivered as they successively reached a safe destination, which would be impracticable, and contrary to the usual course of adjusting such losses.

On the other hand, it is an undoubted rule that goods, or

---

* Benecke & Stevens on Average, 141, and note.

any interest, are not liable to contribute for any general average or expenses incurred subsequently to their ceasing to be at risk; because all that was not actually at risk at the time the sacrifice was made or the expense incurred was not saved thereby, and no interest is compelled to contribute to the loss or expense which was not benefited by the sacrifice.*

II. Light is shed upon this inquiry by referring to the duty of the master, who, in case the vessel is stranded, becomes the agent of all concerned. Duties remain to be performed by the master, as the agent of the owner or of all concerned, after the voyage is suspended by the stranding of the vessel. His duty is, if practicable, to relieve the ship and prosecute the voyage; and his obligation to take all possible care of the goods still continues, and is by no means discharged or lessened while it appears that the goods have not perished with the wreck. Safe custody is as much the duty of the carrier as due transport and right delivery; and when he is unable to carry the goods forward to their place of destination by the stranding of the vessel, he is still bound by the original obligation to take all possible care of the goods, and is responsible for every loss or injury which human skill and prudence could prevent.†

Conscious of the nature and extent of his obligations, the master accepted the services of the several steamers which went to the relief of the ship, and continued his endeavors to save both ship and cargo until the latter was safely delivered at the port of destination, and until the consignees of the ship declined to authorize any further expense.

Evidence, as reported, is satisfactory that the master acted throughout in good faith, and there is not the slightest ground to conclude that he was wanting either in personal energy or in nautical skill. Take the circumstances as detailed in the statement of the case, and it is clear that he

* 2 Phillips on Insurance, ≀ 1407; 2 Arnould on Insurance, ≀ 838.

† The Propeller Niagara, 21 Howard, 27; King v. Shepherd, 3 Story, 358; Elliot v. Russel, 10 Johnson, 7.

could not have been justified in doing less than he did; but the question is, whether or not he was required to do more? Plainly his duty was not ended when the vessel was stranded, nor even when the cargo had been removed for the double purpose of saving it and of lightening the ship, as a part of the means adopted to get her off.

Means devised on the occasion were such as are usually employed for the purpose, and not a doubt is entertained that if the master had been successful in saving the ship as well as the cargo, the whole expense, inasmuch as it was the result of one continuous, unremitted operation, would have been properly regarded as a general average expenditure. Where the ship is stranded, much is necessarily confided to the discretion of the master; and if the ship had been saved through the means which he employed, it is clear that the expenditure would have fallen directly within the definition of general average, as given by the best writers upon the subject.

III. General average denotes that contribution which is made by all who are parties to the same adventure towards a loss arising out of extraordinary sacrifices made, or extraordinary expenses incurred, by some of them, for the common benefit of ship and cargo.

Usual conditions annexed to such a loss, in order that it may be the object of such contribution, as generally stated, are, that it must have been of an extraordinary nature, advisedly incurred, under circumstances of imminent danger, for the common benefit of ship and cargo; and it must have aided at least in the accomplishment of that purpose.*

Suggestion is, that the cargo was separated from the ship; but the mere fact that the cargo is unladen, although it is done in part for the purpose of saving the goods, yet, if it is also done for the purpose of lightening the vessel, and as a means of causing her to float, and of saving her from the common peril, will not necessarily divest the transaction of

---

* M. & P. on Ship. 320; Maclachlan on Shipping, 556; Smith's Mercantile Law, 6th ed. 336; Barnard *v.* Adams, 19 Howard, 270.

its character as an act performed for the joint benefit of the ship and cargo.

Except when the disaster occurs in the port of destination, or so near it that the voyage may be regarded as ended, the master, if the goods are not perishable, has the right, and if practicable, it is his duty to get off the ship, reload the cargo, and prosecute the voyage to its termination.

Where the whole adventure is saved by the master, as the agent of all concerned, the consignments of the cargo first unladed and stored in safety are not relieved from contributing towards the expenses of saving the residue, nor is the cargo, in that state of the case, relieved from contributing to the expenses of saving the ship, provided the ship and cargo were exposed to a common peril, and the whole adventure was saved by the master in his capacity as agent of all the interests, and by one continuous series of measures.

Ship and cargo were in imminent danger from a common peril, and, under those circumstances, it was the duty of the master, as the agent of all concerned, to use his best endeavors and employ his best exertions to save the whole adventure.

Viewing the matter in that light, his first efforts were directed to the object of relieving the vessel by means of the steamers which came alongside; but, finding that the ship was too fast in the sand to be got off by those means, he commenced to discharge the cargo, to save the goods and lighten the ship as, apparently, the best possible measure which could be adopted to save the whole adventure.

IV. None of these propositions are controverted by the plaintiffs; but they insist that the subsequent expenses incurred by the agent of the underwriters of the ship should also be carried into the adjustment, and that the cargo saved by the master should be adjudged liable to contribute towards the expenses incurred by the agent of the underwriters of the ship in accomplishing, at the end of six weeks, what the master abandoned as hopeless and as a total loss.

Before the last-named agent came on board, the master, ascertaining that the consignees of the ship would not au-

thorize any further expenditure, had dismissed the steamers that went to the aid of the ship and had sent back to the port all the steam-pumps and wrecking apparatus he had employed in his endeavors to save the ship as well as the cargo, and had, in fact, decided to abandon the ship as a total loss, and left her in charge of the agent of her underwriters.

Prior to that decision the cargo, except a few remnants of small value, subsequently found in the lower hold, had been discharged into lighters and transported to the place of destination, and had been delivered into the possession of the consignees.

Having saved the cargo, and finding that further efforts to save the ship with the means at his command were fruitless, he relinquished his endeavors and abandoned the undertaking.

Such are the undisputed facts of the case, and, under the circumstances, it is not possible to hold that the ship, as subsequently got off, was, as matter of fact, saved by a continuation of the same series of measures as those by which the cargo was saved.

Complete separation had taken place between the cargo and the ship, and the ship was no longer bound to the cargo nor the cargo to the ship.

Undoubtedly the doctrine of general average contribution is deeply founded in the principles of equity and natural justice, but it is not believed that any decided case can be found where the liability to such contribution has been pushed to such an extent as that assumed by the plaintiffs.*

V. First case cited for the plaintiffs is that of *Bevan* v. *United States Bank*,† which is the strongest reported case in their favor. Plaintiffs were the owners of the vessel, and the defendants were the owners of a certain quantity of specie, which constituted a part of the cargo. Voyage was

---

* Slater *v.* Rubber Co., 26 Connecticut, 129; Nemick *v.* Holmes, 25 Pennsylvania State, 371.

† 4 Wharton, 301.

from New Orleans to Philadelphia; and the vessel was stranded in Delaware Bay in a situation of imminent peril. Statement of the case shows that the specie was among the first articles landed, and it was immediately sent overland to the port of destination, and on the following day was delivered to the defendants. Eight weeks afterwards the vessel reached the same port in safety with the remainder of the cargo, which had been discharged into lighters and was afterwards reshipped. Supreme Court of Pennsylvania held that the defendants were liable to contribute in general average to the charges and expenses incurred subsequently to the landing of the specie.

Much stress is laid, in the opinion of the court, upon the fact that the vessel and the residue of the cargo left on board, were subsequently brought into port by the extraordinary exertions of the master; and if the conclusion can be sustained at all, it must be upon the ground that the whole adventure was saved by a continuous series of measures, prosecuted by the master as the agent of all concerned, which commenced with the saving of the specie, and ended with the saving of the vessel and the residue of the cargo. Stranding in that case was outside of the harbor of the port of destination, and there was no abandonment of the vessel, nor any suspension in the endeavors of the master to save the entire adventure. But the statement of the case shows that the master and mariners remained on board, and that they saved the ship, and having returned the residue of the cargo to the ship, the same was duly transported to the place of destination.* Standard text-writers have doubted the correctness of that decision;† but it is unnecessary to determine the question at the present time, as it is clearly distinguishable from the case before the court.

Second case cited is that of *Bedford Com. Ins. Co.* v. *Parker et al.*,‡ which can scarcely be reconciled with the preceding

* Lewis *v.* Williams, 1 Hall S. C., 436; Gray *v.* Waln, 2 Sergeant & Rawle, 239.

† 1 Parsons' Mercantile Law, 326; 2 Phillips on Insurance, § 1407.

‡ 2 Pickering, 1.

case. Insurers of the ship were the plaintiffs, and the defendants were the owners of the cargo. She was stranded nine miles from the port of destination. Part of the cargo was saved by men employed by the owners of the same, at their own expense. Other parts of the same were subsequently saved by the underwriters of the ship; and it appears that at one time the latter had a hundred men employed in efforts to save the cargo, and the sails and rigging of the vessel. They afterwards entered into a contract with a third party, and agreed to pay a certain sum if he would save the ship and the residue of the cargo.

Reported facts show that the contractor ultimately succeeded, and brought the ship and such part of the cargo as remained on board, safely into the harbor; and the court held, and well held, that only that part of the cargo which was on board when the contract was made, was liable to contribute in general average to pay the amount as stipulated in the contract. Clear inference, from the statement of the case, is, that the master had abandoned the ship, and that he had no participation in the previous endeavors to save the cargo. Decision was, that everything which is saved in such a case, by common expense and labor, shall contribute to pay that expense in proportion to its value; but the court decided that the part of the cargo taken from the vessel by the owners, before the contract was made, was not saved by the successful efforts of the contracting party, and there can be no doubt that the decision was correct.*

Earliest case upon the subject is that of *Shepherd* v. *Wright*,† which was an appeal from a decree in the Court of Chancery. Appellants shipped a part of the cargo, and were the owners of the ship, and the residue of the cargo belonged to the respondents. Ship sailed from Messina, bound to London, and on the voyage she was chased by an armed vessel into Malaga. Advised of the danger, the factor of the ship sent lighters to the master, to save what he could of the cargo;

---

* Columbia Insurance Co. *v.* Ashby, 13 Peters, 331.
† Showers's Parliamentary Cases, 28.

and as the goods of the respondents were silks, they were first carried on shore. Night came, and the armed vessel left, and as the danger no longer continued, the master forbore to land any more of the goods. Six days afterwards the armed vessel returned, and captured the ship and the goods on board, belonging to the appellants.

They brought the bill of complaint against the respondents, to compel contribution; but the chancellor dismissed the bill of complaint, and the decree was affirmed in the House of Lords. Ground of the decree was, that the appellants' loss did not contribute to the preservation of the respondents' shipment. Whole adventure was saved from the first peril, and the shipment of respondents was not exposed to the second, by which the ship and the appellants' goods were lost. Evidently the case was rightly decided, and it is perfectly consistent with the views herein already expressed.[*]

Third case cited by the plaintiffs is that of _Nelson_ v. _Belmont_,[†] which has an important bearing upon the question under consideration. Plaintiff in that case being the owner of the ship, claimed general average contribution of the defendant, as the shipper of a certain amount of specie. Intended voyage was from New Orleans to Havre; but the ship was struck with lightning in the Gulf Stream, and was obliged to make a port of distress. Unable to extinguish the fire, the master signalled a vessel in sight, and accepted assistance. He transferred the specie to the other vessel, and the arrangement was, that the other vessel should accompany the vessel in distress to Charleston; but after arriving in the harbor, and before the vessels reached the wharf, the master took back the specie, and subsequently deposited it in bank. Damage was done to the residue of the cargo by the fire; and the means adopted to extinguish the fire, after the vessel reached the wharf, caused her to sink, and the master was obliged to incur expense to raise the vessel, in order to prosecute the voyage. Judgment of the Court of Appeals was, that the specie was liable, in

---

[*] Benecke & Stevens on Average, 61.    [†] 21 New York, 38.

general average, for the amount paid for the services of the other vessel, and for the expenses incurred at the port of distress.

Precise doctrine advanced was, that the liability to general average continues until the property has been completely separated from the rest of the cargo, and from the whole adventure, so as to leave no community of interest remaining. Majority of the court went farther, and held that if the voyage is not abandoned, and the property, although separated from the rest, is still under the control of the master, and liable to be taken again on board for the purpose of prosecuting the voyage, the common interest remains, and whatever is done for its protection, is done at the common expense. Correctness of that decision cannot be doubted; and yet the question may often arise in practice, whether in a given case the separation is, or is not so complete as to justify the conclusion that no community of interest remains. Close cases may doubtless arise, but it is believed that in general there will not be much difficulty in ascertaining the true line of distinction.

VI. Where a ship was stranded by perils of the sea, and in order to lighten the vessel, the cargo was discharged and forwarded in another vessel, and subsequently *new measures* were adopted, and additional expenses were incurred in getting the ship off and taking her into port for repairs, it was held that the expenses incurred from the misadventure until the cargo was discharged, constituted a general average, but that the subsequent expenses were particular average, and chargeable only to the ship.*

Statement of facts shows that it became necessary to cut a channel for the vessel, and employ a steam-tug in order to get the vessel off; and the view of the court was, that the goods had been previously saved by a distinct and *completed operation*, and that afterwards a new operation began for the benefit of the ship-owner.

---

* Job *v*. Langton, 6 Ellis & Blackburne, 779; M. & P. on Ship. (3d ed.), 322.

Judgment, in that case, was given by Lord Campbell, and in a subsequent case he repeated and enforced the reasons on which the former judgment rested.* Voyage, in the last case, was from Liverpool to Callao. Ship was driven on a bank by a storm, near the port of departure. Cargo was discharged and transported back to the port whence it came, and some days afterwards the ship was got off, taken to the port, and repaired, and again took the cargo on board and proceeded on the voyage; and it was held that the saving of the ship and of the cargo was one continued transaction, and that the expenses were general average, to which the ship, freight, and cargo must contribute. Considering that the goods remained under the *control of the master* until the ship was got off, repaired, and was enabled to take the goods on board and prosecute her voyage, it is clear that the decision was correct, and entirely consistent with the previous adjudication.†

Applying those principles to the present case, we are of opinion that there was no community of interest remaining between the ship and the cargo when the master, as declared in the statement of the case, abandoned the ship, and left her in charge of the agent of the underwriters, after the consignees of the ship had declined to authorize the master to incur any further expense.

Judgment of the Circuit Court is therefore reversed, and the cause remanded, with directions to issue a

NEW VENIRE.

---

* Moran v. Jones, 7 Ellis & Blackburne, 532.
† Maclachlan on Shipping, 573, 576.