## Case No. 4,241.

### The E. A. PACKER & The JOHN NEILSON.

[10 Ben. 520.][1]

District Court, S. D. New York. July, 1879.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

Scudder & Carter and Geo. S. Black, for libellants.

E. D. McCarthy, for the tug.

P. Cantine, for the barge.

CHOATE, District Judge. This is a suit to recover damages caused by a collision between the schooner N. H. Hall and the barge John Neilson, on the evening of the 24th of September, 1878. The schooner had arrived in the North river, off 30th street, in the afternoon of the 23d of September, with a cargo of paving stones from St. George, in the state of Maine, and at about four o'clock on that day she came to anchor, to await her turn to discharge at the pier at the foot of 30th street. She anchored about 180 feet out into the river from the end of that pier and about the same distance down the stream from the pier. The collision took place between seven and eight o'clock in the evening of the next day after she came to anchor. The tide was flood, and she was heading down the river. It was after dark, and she had a proper anchor-light set in her fore-rigging. She was laden with about four hundred tons of stone. The evening had been rainy, but it was clearing away, and some stars were visible, and lights of vessels could be seen without difficulty. The steam-tug E. A. Packer took in tow the barge John Neilson at pier 4, East river, at about six o'clock, to be towed round to a pier just below 33d street, North river. This pier was a short pier between the two long piers at 30th and 33d streets. The barge had been a side-wheel steamer. She was 175 feet long and 28 feet wide, sharp forward under water, having a main deck, and over that a roof or upper-deck some twelve feet above the main deck, and on top of that forward a pilot-house or wheelhouse in which was the wheel by which she was steered. From the rail to the roof or upper-deck were curtains on both sides, so that she offered a large surface to the wind. Her crew on this occasion consisted of two men, one her captain, who was not a licensed pilot, and was stationed in the wheelhouse, and the other a deck hand. She was towed by a hawser forty or fifty fathoms in length. As the tug with the barge in tow came up the North river she ran along on the New York side, and when she reached the vicinity of 23d street ferry slip, they were about three hundred feet out from that ferry slip and heading directly up the river. In order to put the barge into her berth, the captain of the tug concluded to take her alongside instead of keeping her on the hawser, not feeling sure that those in charge of her could bring her safely and properly up to her berth, if brought up by the hawser. He desired to take the barge on his port side as the tide then was, in order to put her at the dock. For the purpose of making this change, when the tug was opposite 23d street ferry slip, and then heading with her tow directly up the river, and a little to the westward of the schooner, the tug slowed, sheered off a little to port, and gave a signal to the barge to throw off the hawser, and those on the tug immediately commenced hauling in on the hawser. The barge with the momentum which she had, prior to the slowing of the tug, kept on up the river, passing the tug on the tug's starboard side and very close to her, the tug meanwhile reversing her engine, intending to go under the stern of the barge and come up on her starboard side when the barge had got by, and there make fast to her starboard quarter. The captain of the barge testifies that the hawser was thrown off only a short distance below 30th street; but he is evidently mistaken, and the overwhelming weight of the testimony from both vessels is that this manoeuvre was commenced as low down as 23d street, and that the barge came up to and passed the tug about off 25th street. As the barge passed the tug the captain of the tug called out to the captain of the barge to look out for the barge till he got round on the other side, and the captain of the barge replied, saying in substance that he would look out for the barge. The tug then came up on the starboard quarter of the barge and they were in the act of making the lines fast between the barge and the tug when the barge came into collision with the schooner. The starboard bow of the barge struck the starboard bow of the schooner, knocking a hole in her so that she sank in about five minutes, and her crew took to their boat, losing all their effects. Shortly before the barge struck the schooner, the captain of the tug, which was then lapping the starboard quarter of the barge, and just passing her lines to the barge, saw the danger and called to the captain of the barge to starboard his wheel. The testimony tends to show that he called to him twice to this effect. The captain of the barge testifies that he did starboard his wheel, as

soon as he saw the schooner, and had it hard a-starboard at the time of the collision. Although this witness is very seriously contradicted on other points, I think there is not sufficient ground to reject his testimony on this point; but it is obvious enough that if his statement is true, he did not starboard soon enough to steer clear of the schooner, with such steerage way as the barge then had.

The light of the schooner had been seen on the tug before she signalled to the barge to throw off the hawser, as well as the lights of quite a number of other vessels at anchor, lying to the westward and northward of the schooner. The space between the schooner's light and the next westerly light observed by those on the tug, seemed to them to be about a hundred yards, and the testimony shows that this judgment was about right. The captain of the tug judged that the space between these two lights was sufficient for him to go through in safety, though he was not certain whether the light on the schooner was a vessel's light or a light on the end of the pier at the foot of 30th street. The distance from him of the schooner, and the nearest of these other lights, when he slowed and gave the signal, was about a third of a mile. These lights, including the schooner's light, were also seen by the deck-hand on the barge, when she was about off 24th street, before she passed the tug, and he observed that the barge then headed a little to the westward of the schooner's light. But so far as appears, he did not report the light to the captain, who acted as wheelsman, and also as lookout, so far as there was a lookout on the barge. The captain of the barge says that the tug obstructed his view of the light till he got within about a barge and a half's length from the schooner, and that then, the tug getting out of his way, he saw the light, and immediately starboarded to clear it. But as, on the other point above referred to, his testimony as to the time and place when and where the tug got out of the way of the barge, is clearly overborne by all the other evidence, and he is on this point also evidently mistaken, and if he did not see the schooner's light from a point off 24th street, or thereabouts, it was because he was negligent in his observation and kept no good lookout. It may well be that he did starboard when he saw that he was running into her.

It is evident enough that the collision was caused by the negligence of the tug, or of the barge, or of both of them. The libel charges that it was caused by the "negligence and unskilfulness of those in charge of said tug and barge, in that said barge was brought by said tug into such close proximity to said schooner, and said barge was improperly navigated by those in command of her, and was without any lookout or light, and that no sufficient lookout was kept upon said tug-boat, nor was the speed of said barge and tug slackened in due time, and in allowing said barge to collide with a vessel at anchor." No point is now made that the barge had not proper lights. The tug and the barge, while both insisting that the schooner was anchored in an improper place, a point hereafter to be considered, attempt to throw on each other the fault of the collision. The barge insists that so far as she was concerned, the collision was inevitable; that she was cast off by the tug at such a rate of speed, and so headed towards the schooner, and at such a short distance from her, that when the tug, by sheering to port, first uncovered to her the schooner's light, it was impossible, by the utmost exertions of her wheelsman, to clear the schooner; that she did all she could, but the distance was too short to sheer the barge sufficiently. The tug, on the other hand, insists that the barge, from the time she was cast off, had entire control of herself, so far as the avoidance of the schooner was concerned; that she had steerage way and could, by starboarding in time, have avoided the collision; that it was not negligent to cast her off at the time when and under the circumstance under which it was done, and that the collision was, aside from the improper anchorage of the schooner, caused solely by the gross negligence of the wheelsman of the barge, in not steering her properly, and by the obstruction of the cleats and chocks on the barge, which, it is claimed, delayed the efforts of those on the tug, in making fast to her, when the danger was discovered, and when, if the tug could have been immediately made fast, she might, by backing, have saved the barge from striking the schooner.

As regards the plea of the barge, it is enough to say that the alleged facts, on which it is based, have no support in the evidence. There is, indeed, great conflict of evidence, or rather of opinion, whether the barge continued to have steerage way up to the time she reached the schooner, and also as to her speed through the water at the time she was cast loose, and how much it was diminished before the collision; but there is little or no doubt upon the evidence that for a considerable part of the distance between these two points, she had steerage way, and that if her captain had, at an earlier point of time, observed the schooner's light, and starboarded, he could have avoided her. It is quite clear that he did not keep a good lookout, and there was nobody else on the barge acting as lookout. This throws on the barge the presumption that the want of this lookout was the cause, or one of the causes, of the disaster. And she has not shown, and cannot show, that if she had kept a better lookout, the disaster would still have happened. It is urged, on behalf of the barge, that her being thus cast loose was wholly the act of the tug, that she was not informed, at the time she was taken in tow, of the intention of the tug to take her

alongside. This may be, but it certainly does not excuse the barge from the prompt and vigilant use of such means of avoiding danger as were within her control, when she thus found herself cast loose from the tug. It might excuse her for not having a full and proper complement of men for her navigation in such unlooked-for circumstances, provided her crew were full and sufficient for the mode of navigation she had a right to expect; but clearly it does not excuse the failure of the men she did have to use proper skill and vigilance. The charges of the libel are therefore made out.

As to the plea of the tug, the real questions are, first, whether it was a safe and prudent thing to do to cast off the barge under all the circumstances existing; and secondly, whether, if it might have been in itself safe and prudent so to do, the tug was chargeable with negligence in the lookout she kept and the mode of her navigation after casting off the barge, and whether this want of care in either respect caused or contributed to the disaster. The argument on the part of the tug is, that the barge having good steerage, there was no fault in casting her loose; that from that time the tug ceased to control or be responsible for her movements; that she had plenty of room to pass on the schooner's starboard hand, and that therefore there was no negligence in casting her off. It is true, that when she was cast off, new duties as to keeping a lookout and as to steering devolved on the barge; but while the actual connection between the tug and the barge was for the moment dissolved, the barge was still under the general care and charge of the tug, and the tug was surely bound to common vigilance and skill in guarding against and avoiding any dangers to which, while thus separated, the barge should be exposed, or to which she might expose any other vessel. While it is true that the barge had some power over her movements by her wheel so that she could sheer one way or the other, she was in all other respects helpless. She had no means of accelerating or retarding her forward movement. She must go forward just as she was acted upon by the tide and wind, and by the momentum she had received till that was spent. The evidence is very conflicting as to the speed she had. The weight of the evidence is, that, when she was cast loose, she was going at least five or six miles an hour through the water, and with the tide in her favor a mile and a half to two miles faster. The evidence, also, is that when she struck the schooner she had still some headway through the water. At any rate, it is certain that she was shot out up the river with sufficient momentum to carry her in a very short time by her momentum alone, together with the effect of the tide and wind, over the intervening space between her and the schooner, and some distance beyond. It is in proof that as the speed of such a barge

diminishes, she loses very rapidly her steerage way, and is easily diverted from a straight line, and not easily controlled by her rudder; that the wind, unless it is very nearly with her, or against her, has a very considerable effect in throwing her stern off, and thus in altering her heading. The wind, at this time, was not strong, and was southeasterly, striking somewhat on her starboard quarter, and may have been sufficient to affect somewhat her course, changing her heading to the eastward. The captain of the tug had full notice of all these peculiarities of the barge, and of all these other matters. He also knew that the barge had but two men on board, and that one of these would necessarily be occupied with attending to the lines, till the vessels were again made fast to one another, thus leaving the wheelsman alone to act as lookout on the barge. It has been so often held improper for the same person to act as wheelsman and lookout, that it is unnecessary to cite any authority to show that the tug thus had notice that in executing this manoeuvre the barge would be left with a defective lookout, which is itself negligence, and held to be presumptively the cause of a collision that may be attributable to the want of a proper lookout. I think, therefore, that it was in itself negligent and improper, and showed a want of due care for the tug, to launch this barge out in the direction of this schooner and these other vessels, at a distance which was not clearly sufficient to enable her to overtake and make fast to the barge before reaching them. It involved too much risk of collision through a necessarily defective and insufficient lookout on the barge and through possibilities not easily calculated of her becoming unmanageable before she was again secured. I think it was not shown that there was any appreciable delay in the tug's making fast to the barge by reason of the cleats and chocks on the barge being blocked by freight. Nor have I given any consideration as against the tug to the suggestion, which has some support in the testimony, that the usual and more skilful mode of putting this barge in her desired berth, would be to have kept her on a hawser, gone up the river and rounded to and brought her down head to the tide, in which case she would have gone outside this fleet of vessels. I do not see that the tug would be chargeable with negligence or want of care towards the schooner, in executing the manoeuvre she undertook to execute, even if it were not the usual and best one for effecting the purpose she had in view, provided she did it in a safe and proper way, and had room enough to execute it without danger of collision with the schooner, and her liability rests not in her executing an unusual, or even foolish, manoeuvre, so far as berthing the barge was concerned; but upon doing it in a way and under circumstances involving danger to this schooner. It is also clear that the tug did not, aft-

-er casting off the barge, keep a good lookout. In fact, she did not pretend to keep any lookout at all. As above suggested, her duty of vigilance was not discharged by her casting off the barge. In fact, the captain and all hands went aft to attend to getting the hawser in and to making the change to the other side. If he had kept a lookout on the tug, or put a lookout on the barge, he might at least have discovered the danger sooner. He thought it his duty to warn the captain of the barge to starboard his wheel when he did discover the danger, and no doubt it was; but if he had warned him sooner, the collision might have been averted altogether. The charges of the libel against the tug are therefore also made out.

It is, however, claimed by both the tug and the barge, that the schooner was guilty of negligence which caused or contributed to the disaster, by anchoring in an unsafe place, much frequented by vessels going into and coming out from the piers in that vicinity. I think this is no answer for these vessels, which had her in plain sight all the time. Apart from the question raised as to the rules of the harbor-masters, she was lawfully there, and they knew she was there, and there is no fault on her part which contributed to the injury.

It was proved that by regulations then in force, adopted under the provisions of the New York statute of 1862, c. 487, all vessels are prohibited under a penalty from lying at anchor within three hundred yards of the line of the docks at this place. She was violating this regulation, but it was proved that her master had no knowledge of the regulation; that the vessel belonged in the state of Maine and was a stranger here. It also appeared that, notwithstanding the regulations, vessels do constantly lie at anchor in that vicinity inside the line, and while she was lying there, quite a fleet of vessels was anchored there within the line. And it also appeared that the captain of the tug was in the habit of going up and down the river, and was therefore aware of the practice. Under these circumstances, it would be manifestly unjust to hold this schooner to have forfeited her right to compensation by her violation of the regulation, nor do the authorities so hold. No case is cited where a vessel has been held to the rule of contributory negligence in such a case, unless notified of the rule. All persons may be held to take notice of laws, but such regulations, though made in pursuance of lawful authority, are not laws. In the case of The McDonald, decided by Judge Betts [Case No. 8,755], there was express notice of the regulation. It seems, also, that such municipal regulations may be shown to have been waived by the acquiescence in their non-observance by the local authorities charged with making, altering and enforcing them. The John Frazer. 21 How. [62 U. S.] 188. Such a waiver was proved in this case.

It is also claimed, on the part of the claimants, that the schooner was in fault in not having a proper anchor-watch, and in not slacking her chain at the instant of collision so as to fall back. This defence is not fairly raised by the pleadings, but it has no support in the evidence. The lookout on the schooner had no reason to suppose the tug and tow would strike the schooner till just at the instant of collision, and it neither appears that there was time to do anything to avoid it, nor that slacking the chain, if it could have been done, would have been effectual. The Lady Franklin [Case No. 7,984].

Decree for the libellants against both tug and tow, with costs, including that part of stenographer's fees paid by the libellants and left by stipulation subject to the direction of the court.