RALLI *et al. v.* TROOP *et al.*

(*District Court, S. D. New York.    March 4, 1889.*)

1. SHIPPING—AVERAGE—FIRE—WATER DAMAGE.
    By our law, as well as by the York-Antwerp rules, the ship-owner is entitled to general average contribution from the cargo for water damage done to the vessel in extinguishing fire.

2. SAME—NEGLIGENCE—WHAT CONSTITUTES—EVIDENCE.
    No general average contribution is due from the cargo to the ship-owners if the sacrifice is caused by such negligence of the vessel as the ship-owners are responsible for.    *Held*, on the facts, that no negligence of the vessel was shown.    The omission to comply with a port by-law requiring a locked lantern, is not, of itself, negligence, when such a regulation is not enforced by the local authorities, and is not shown to have been known to the master, and where the usual ship's lantern was actually used.    The proceedings before a foreign board of inquiry are not legal evidence here.

3. SAME—SACRIFICE ORDERED BY PORT AUTHORITIES.
    To entitle to general average contribution, the act of sacrifice need only be ordered by those who for the time being are in lawful control of ship and cargo, and, although this fire was finally extinguished under the direction of the port authorities, *held* that, as this was done by them while in control, under the *lex loci*, and as the act was a maritime act for the common benefit of vessel and cargo alone, and not for the supposed interests of other property in the port, the ship-owners were equitably entitled to contribution, under the maritime law, as if the master had retained sole control, and ordered the sacrifice.

4. SAME—ADJUSTMENT.
    A British ship was chartered to load saltpeter and jute at Calcutta for a voyage to New York.    The charter-party provided that all questions of general average should be settled in accordance with the York-Antwerp rules and the customs of the port of destination.    After the vessel had loaded at her moorings, and was getting under way, fire broke out in the fore hold,

which the mate and men on the ship and those summoned from other vessels were unable to put out. The port authorities thereafter took charge, in accordance with the law of Calcutta. A portion of the cargo was unladen, and finally the vessel was scuttled, and the fire "drowned out." The rest of the cargo was thereafter taken out in a damaged condition, and sold by the master, and the sound cargo was forwarded for the owner's account to the port of destination, and there delivered. A general average bond having been given for the cargo, and an adjustment had, by which the ship-owners were allowed for the injury to the vessel caused by swelling of the jute, and for other water damage, *held*, in an action brought by the cargo owners against the ship-owners, claiming to recover the whole value of the cargo sold in Calcutta, that, as no errors in the adjustment had been shown, the ship-owners should be allowed such general average contribution, and libelants have a decree only for the amount due them under the adjustment.

In Admiralty.

Libel, by Stephen H. Ralli and others against Howard D. Troop and others, to recover $22,000 for cargo sold by master at Calcutta, in March, 1886.

*Sidney Chubb*, for libelants.

*Wing, Shoudy & Putnam*, for respondents.

BROWN, J. The ship J. W. Parker, of 1,190 tons, was chartered by the libelants to load at Calcutta with saltpeter and jute in bales. On the morning of February 18, 1886, as the ship was getting under way, a fire broke out in the fore hold, which the men on board the ship and from other vessels in the neighborhood were unable to put out. After a half hour's work it was somewhat subdued, the hatches were put on to smother it, and the pumps were kept playing. Not long after, the port authorities came, and took general charge of the efforts to put out the fire, pumping large quantities of acid, steam, and water into the ship. That night the fire smoldered, all the openings being covered. The following day, 552 bales of jute were taken out by the master, when the port authorities required that she should be removed to the flats where the tide could flow over her, for the purpose of extinguishing the smoldering fire. The rest of the cargo was subsequently taken out in a damaged condition, and sold by the master for $20,723.83, for which sum the libelants, as owners of the cargo, asked a decree.

The defendants claim an offset for a general average charge in favor of the ship as against the proceeds of sale, on the ground that the ship was sacrificed for the safety of the cargo; the water that was poured in, and that flowed over her after she was scuttled, in order to put out the fire, having practically destroyed the ship, through the expansion caused by the water in the jute bales that had been screwed tightly into the hold. A general average adjustment was made, first at Calcutta, and afterwards at New York, the port of destination. By this adjustment, allowing the general average claim of the ship, the sum of $7,420.48 only was found due to the libelants out of the proceeds of ship and cargo. The libelants having refused to admit their liability for a general average contribution, that sum has been paid into the registry of the court. The libelants resist the general average charge on the ground that the fire was caused by the ship's negligence, and that the scuttling and loss of the

ship were under the order of the port authorities, and not of the master.·

1. *As to negligence.* It is no doubt the ordinary rule in the law of general average, that, where the ship's negligence has made the sacrifice necessary, she cannot recover a general average contribution from the cargo. Many of the maritime codes expressly so provide; and the text-books so state the rule. See the recent case of *The Ontario, ante,* 222. This proceeds, as I understand, upon the ground that the ship is herself responsible to the cargo for her own neglect. She therefore cannot take from the cargo under the name of "general average" what she is at the same moment bound to make good and restore by reason of negligence. If that is the foundation of the rule, it cannot apply to those causes of sacrifice for which the ship and owners are not legally liable; and by the British statute, as well as the statutes of the United States, there is no liability for loss by fire "without the owner's fault or privity." Macl: Shipp. 9, 121; Rev. St. U. S. § 4282. To deny the owners the benefit of a general average contribution on the ground of negligence would impose upon them, in effect, a liability for the fire, from which the statute exempts them.

This ship belonged to New Brunswick, and the owners are therefore exempted from any liability by reason of this fire, there being no fault or privity on their part. The charter, moreover, provided that "all questions of average should be settled in accordance with the York-Antwerp rules, and with the established usages and laws of place of destination." Rule 3 of those rules declares that "damage done to the ship or cargo, or either of them, by water or otherwise, in extinguishing fire on board the ship, shall be general average." This rule does not except cases of negligence by the ship, nor require the sacrifice to be made by the master, or by his order. In the Antwerp conference of August, 1885, the question was propounded whether the rules should be modified in case the original cause of the loss was the ship's negligence, or the proper vice of the ship or cargo. The solution determined by the conference was that "the rules of common average ought to be applied, even though the danger, the primordial cause of the sacrifice or expense, had been brought about by the fault of the captain or crew, or of a person interested in the cargo, or by the proper vice of the ship or cargo; the recourse that the fault or proper vice gives ought to be kept independent of the rule of common average." 5 Valroger Droit Mar., App. question 32, p. 389; solution 22, p. 405. The cause of the fire, and, therefore, the alleged negligence, are moreover not established in this case with any certainty. The cargo had been covered the night before, preparatory to sailing. On the morning of the fire, as the ship's chains were being hove in, one of the seamen was directed to go into the chain locker forward to stow them away. He took a globe lantern, and went into the chain locker, through a narrow passage between the bales of jute under the deck, and about 10 or 15 minutes afterwards was heard to scream, and at the same time smoke came pouring out of the hatch. The libelants charge that the jute was set on fire by some improper use of the lamp. But there is no proof of this. The lamp may have been taken out of the lantern, or

broken accidentally in handling the chains. The respondents claim that the fire was spontaneous, and naturally showed itself soon after the opening of the hatch gave it air. Jute in bales is liable to spontaneous combustion; and, as the seaman lost his life, there is no testimony sufficient to determine with any certainty the origin of the fire. The proceedings of the marine court of inquiry at Calcutta are not competent evidence here. The frequency of fires in cargoes, and the difficulty of determining their origin, are said to be among the reasons of the statutes exempting owners from liability for damage by fire. A regulation of the port of Calcutta required that no lantern should be taken below except by an officer, and only when it was secured by lock and key. There is no proof that the master or officers of this vessel had any knowledge of this regulation. The regulation is a strictly local one. The evidence shows that other foreign vessels at Calcutta had no knowledge of it; and it would seem to have been a dead letter. The port pilot, who was in charge of the ship at the time, was not examined in reference to it. The lantern is proved to have been such as was usual in such vessels, having brass guards, with the lamp fastened by a screw at the bottom. The failure of foreign ships to comply with local regulations not brought to their knowledge does not, in general, constitute a fault. *The J. Fraser*, 21 How. 184, 188; *The New York* v. *Rea*, 18 How. 223; *The E. A. Packer*, 10 Ben. 520.

The question of negligence, as respects general average, must be determined according to the general rules of navigation. Manifestly the use of an unlocked lantern in going below cannot be held to amount to negligence in one port, and not in another, upon the same voyage and with the same cargo. This was the ordinary ship's lantern, secured like those in almost universal use. The use of such a lantern was not in itself negligence. The chief witness for the libelants on this branch of the case, Inspector Forsyth, says twice that it was not unsafe to go below with this globe lantern. It is not at all certain, as above stated, that the lantern caused the fire; or, if it did, that its being unlocked had anything to do with it. I think the claim of general average cannot be rejected on these grounds.

2. *Sacrifice.* The libelants contend that the sacrifice of the ship arose from her scuttling; that this was done by the order of the port authorities, and was not by the act of the master; and that the motive was not the preservation of the cargo, but the protection of the port, and of other vessels and property. By the local law it appears that the commissioners and, under them, the conservator of the port of Calcutta, have a general authority over vessels on fire; and the master is subject to heavy penalty, in case of fire, for not taking the proper order, and observing their directions. Calcutta act of 1875, §§ 17, 36. The master, when this fire broke out, was ashore seeking a tug. The chief officer gave the alarm, and the port officials soon appeared, and took the chief direction of affairs. The master, several times during the following two days, was desirous of having the hatches opened, and of removing more bales, which the officials prevented. But it is evident from their testimony that the

fire was at no time subdued until it was "drowned out" by scuttling the ship. Large quantities of carbolic acid, steam, and water had successively been pumped into the ship without extinguishing the fire. The master did not object to the scuttling. The chief difference between them was in respect to keeping the hatches open longer for the purpose of removing more of the cargo, to which the officials objected in consequence of the increased draft of air serving as fuel to the flames. It is perhaps to be inferred that the general authority given to the port officials was either on account of their better knowledge of the mode of dealing with fires likely to arise in cargoes shipped at that port, or for the protection of the port or other shipping, which might sometimes require other measures than the masters might adopt; and if it appeared in this case, or if the evidence warranted the inference, that their measures were adopted in view of any actual or supposed danger to the port, or to other ships, and that they acted differently than if the common benefit of the ship and cargo alone were considered;—in other words, if there was any sacrifice of the ship and cargo for the supposed interests of other property,—I should consider the case not one of general average. But there is no evidence to warrant any such inference. This ship was far from shore, and apparently threatened no other property. The circumstances do not indicate that there was any conflict of interests between the ship and the shore, or that the port officials in any degree designed to sacrifice, or did sacrifice, any interest of the cargo to the safety of other property. There was no occasion, and no motive, for their doing so. The most that can be inferred is that there was some difference of judgment between them and the master as to the amount of exposure that it was prudent to permit to the smoldering fire; and in a case of a difference of judgment the determination must rest with those upon whom the law for the time being imposes the responsibility of action,—in this case, the port officials. There is no sufficient reason to conclude that they did not act intelligently and honestly, or that their order to fill the ship with water was not the best thing that could be done for ship and cargo. The interests of all were apparently identical. It is sometimes said that the sacrifice, in order to give rise to general average contribution, must be made by the master, or by his order. *Wamsutta Mills* v. *Old Colony*, 137 Mass. 471, 474. But this is not exact. Such a condition is not an essential part of the right to a general average contribution. It is sufficient if the sacrifice be made for the common benefit, and by those who for the time being are charged with the control and responsibility. The duty of contribution is one of the oldest maritime rules. It does not rest upon contract, or upon any artificial theory of agency, but upon the fundamental natural equity, that what is sacrificed for the safety of all shall be made good by contribution from all that is thereby saved. The sacrifice is, doubtless, usually made by the master. But his order is not essential. Such a condition forms no part of the prescriptions of most of the maritime codes. Among the provisions of very many of these codes to be found in the appendixes in Lown. Av. (4th Ed.) 351–672, I find no such requirement, except in the Code of Germany, § 702. Val-

roger, commenting on this peculiarity of the German Code, says, (5 Droit Mar. § 2006:) "An action for contribution cannot be denied simply on the ground that the jettison was made without the captain, if it was really necessary." Ulrich, the German commentator, observes upon this text of the German Code that what is meant is, "the commander of the vessel at the time;" and that a proper order made by the next officer in command during the master's temporary absence would be a case of general average. Upon the same view he further states that, where a pilot is in command, he is considered as the master's representative; and that the pilot might order the sacrifice "in conflict with the master, without depriving the sacrifice of the character of a general average loss." Haverei-Gesetze, 6, 7. In *Price* v. *Noble*, 4 Taunt. 123, general average for a jettison was sustained in the case of a British ship, though the jettison was made by a prize crew put on board upon a capture by a French privateer. In *Walker* v. *Insurance Co.*, 11 Serg. & R. 61, Chief Justice GIBSON says that "the loss must arise from the direct agency of some one acting for the general benefit;" and the general rule requires only that that person shall be some one having lawful authority to determine for the time being. In *Lawrence* v. *Minturn*, 17 How. 100, 110, Mr. Justice CURTIS, speaking of a jettison, says: "It will be deemed to have been necessary for the common safety, because the person to whom the law extended authority to decide upon and make it has duly exercised that authority."

Under the local law of Calcutta, the port commissioners for the time being had this authority. They were in the situation of master as respects all measures to be taken to put out the fire, and for the common benefit. To disobey them was a criminal offense in master or crew. For the most part, they and the master acted in concert; and upon a difference of judgment as to the length of time it was expedient to keep the hatches off, or to delay filling the ship with water, since fires in jute cargoes were not uncommon in Calcutta, it is probable that their judgment was better than the master's, and this may be one reason why this authority was committed to them. Both ship and cargo were subject to the operation of the municipal law of Calcutta so long as they remained in port; and it is that which made the conservator's order equivalent to the master's. This in no way excludes the application of the maritime law as respects contribution. In hundreds of cases the municipal law becomes the basis of the application of maritime rules; cases of pilotage, and of statutory liens for supplies are familiar instances. In the case of *Wamsutta Mills* v. *Old Colony, supra*, emphasis was laid upon the fact that the ship was moored to the wharf, and subject to the general police authority on shore. This case is different. The ship was not along-side the wharf, but far away, and the conservator's authority over the ship was special. The act of filling and scuttling was a maritime act, in the interest of the ship and cargo only, and, as I think, subject, as respects contribution, to the maritime law. It is not uncommon that municipal aid is obtained in extinguishing fire. *Nelson* v. *Belmont*, 21 N. Y. 36. If that is ever to be held sufficient to absolve from

the duty of contribution, it is not, I think, in a case like the present.

Considering that the whole doctrine of general average rests upon the highest equity; that no technical rules prevent its application to all cases that come within its general purpose; that the York-Antwerp rules were specially adopted by this charter; that there was no opposition of interests in the sacrifice made by filling and scuttling the ship; that the port officials were by law in command while the ship was on fire; that the purpose of the act of sacrifice was the common good of the ship and cargo alone; that the circumstances indicate that there was not in this case any interest of the port or of other vessels that in the least influenced the port officials in their action, or the smallest sacrifice of the ship or cargo in reference to any outside interests; and that there is no reason to suppose that the orders were not honestly and intelligently given, or were not such as the officials would have given, as actual master, having nothing in view but the common benefit of ship and cargo, —I think the claim of general average contribution should be sustained. By the law of this country, water damage is a subject of contribution, (*Heye* v. *North German Lloyd*, 33 Fed. Rep. 60, 36 Fed. Rep. 705,) and in this case, as I have said, the charter expressly adopted the York-Antwerp rules, which so declare, (rule 3.) These rules do not require the master's order. An average bond having been given by the libelants, and the loss being adjudged a proper subject of general average, and no errors being shown in the adjustment, the decree should be for the libelants for the balance stated by the adjustment. Though the libel does not claim the amount resulting from the general average, but the whole proceeds of the cargo, the amount due the libelants on the average adjustment having been paid into court, it should be decreed to them, under the prayer for general relief. *Dupont* v. *Vance*, 19 How. 162; *The J. P. Donaldson*, 21 Fed. Rep. 673.