Selden, J.
 

 No objection was made by the counsel upon the argument, to the principles upon which the general average was adjusted in this case, provided the specie was liable to contribute to such average for the expenses and loss which occurred after it was placed on board the Danish brig. Whether it was so liable, therefore, is the only question to be considered.
 

 General average losses arise, either from voluntary sacrifices made, or extraordinary expenses incurred, for the joint benefit of the ship and cargo. The property which contributes, is that which is saved from the peril, together with that which is sacrificed for the preservation of the rest. The loss, however, does not in all cases fall upon the whole of this property. Arnould says: “All which is ultimately saved out of the whole adventure,
 
 i. e.,
 
 ship, freight and cargo, contributes to make good the general average loss, provided it had been - actually
 
 at risk
 
 at the time such loss was incurred; but not otherwise, because, if not at risk at the time of. the loss, it was not saved thereby.” (2 Arnould on Ins., Perkins ed., § 338.) Phillips uses similar language. He says: “ Goods or any interest are not liable to contribute for any general average, or expenses incurred subsequently to their ceasing to be
 
 at risk."
 
 (2 Phillips on Ins., 3d ed., § 1407.)
 

 The defendant’s position here is that the spebie, when once placed on board the Danish brig, being entirely secure from the peril which threatened the Galena and her cargo, was, under the rule laid down by Arnotjld and Phillips, exempted from contribution for subsequent'losses.
 

 In determining this question,
 
 it
 
 will be necessary to recur to the principle upon which general average is based. That
 
 *39
 
 principle is, that where several persons are engaged in a joint enterprise, whatever is necessarily done-for the Common benefit ought to be done at the common expense. It is of the essence of 'this principle that it looks upon the enterprise as a whole, as an entirety. It is true, that in apportioning the loss, regard is had to the interest of the respective parties. But in other respects, no separate interest is recognized. Until, therefore, some portion of the property has been separated from the rest, so as no longer to have any interest in common with it, every risk which affects the enterprise as a whole must be regarded as affecting each portion of the property engaged.
 

 Such a separation may, and frequently does occur, in the course of a voyage. For instance: in case of a jettison, the goods jettisoned do not contribute for any damage afterwards done to the residue of the cargo. If goods forming a portion of the cargo are sold for the necessities of the ship, or are delivered to the owner or consignee either before or after the arrival of the vessel at its port of destination, and before the occurrence of a general average loss, they do not contribute. So a separation may occur, through the withdrawal by the owner of a portion of the goods before the termination of the voyage. This every owner has, in general, a right to do, at any time, on paying the freight for the entire voyage, and the goods thus withdrawn are exempt from contribution fan any subsequent loss, upon the principle that it is the goods at risk only which contribute.
 

 If however, the case of
 
 Bevan
 
 v.
 
 The United States Bank
 
 (4 Whar., 301), wás correctly decided, this principle of exemption arising from the separation of a part of the cargo from the rest, is subject to a very important qualification. The vessel in that case was on a voyage from Hew Orleans to Philadelphia, and became stranded and ice-bound in Delaware Bay, but a short distance from her port of delivery. She had on board $90,000 belonging to the defendants. It was necessary to discharge her cargo; and the specie was first removed, being taken on sleds to the shore, and delivered the next day to the defendants. Two months afterwards, the vessel reached Philadelphia
 
 *40
 
 in safety with the residue of her cargo, which had been dis- • charged into lighters and afterwards re-shipped. During this interval a number of additional charges had been incurred for the safety of the vessel and the remainder of the cargo. The action was brought to recover the defendants’ proportion of the general average loss; and the question-was, whether they were liable for the expenses which had been- incurred, after the specie had been delivered to them at Philadelphia. The court held that they were.
 

 This case can only be reconciled with the general doctrine, m regard to the effect of the entire separation of one portion of the cargo from the rest, and from all the perils of the voyage, by adopting the distinction upon which a careful examination of the case will show the decision to rest, viz.: that although the delivery of a part of the cargo to its owner at any time before a peril has occurred, will discharge it from its liability to contribute fqr a subsequent loss; yet, that after such occurrence, and after measures to avert the peril, involving •expense, have been commenced, there can be no such separation of any portion of the property from the residue as will exempt it from contribution for the entire loss.
 

 Upon what is this distinction based ? It is clear that general average does not rest upon any implied agreement among the several owners that their property shall abide the fate -of the joint adventure, but upon the simple fact of a community of interest at the time of the loss. The whole doctrine that it is ■the property at risk only which contributes, is founded upon this theory. But the distinction referred to assumes that when a peril is once encountered, and'some expense has been incurred to avert it, an obligation is imposed upon the various owners to abide the result of all the efforts and sacrifices required to avert that single peril, however remote may be its termination.
 

 This obligation, if it exists, must have a foundation. It is-rested by the court in that case mainly upon two grounds. The. first is, that a rule which would exempt property which had escaped from the peril from liability to contribute to the expense incurred afterwards would be unjust; because it
 
 *41
 
 “ would subject those whose goods are saved and delivered last to the payment of a portion of the expenses incurred in saving those of the first, without requiring the first to pay any part of the expenses incurred in saving the goods of the last,” .and 'would thus “operate partially and unequally, without imposing the obligation of reciprocity, which seems to lie at the foundation of general average.”
 

 'Is this reasoning sound? The owner of the goods saved last contributes to the expense of saving the first, because that expense was incurred for his own benefit, and to save his own goods in common with those previously saved; but if the owner of goods once saved from the peril, pays for expenses or losses accruing afterwards, he pays for that from which he could not by possibility derive any benefit. It will be found difficult, I think, to sustain the doctrine upon this idea of reciprocity.
 

 The second ground taken by the court in support .of its decision, is, that the case is analogous to that of
 
 a
 
 partnership. Kennedy, J:, in giving the opinion of the court, says: “Now in the case before us it must'be admitted that the property of the defendants, and that of the plaintiffs, formed, as it were, a
 
 common stock of
 
 a sea venture, held by them in their several proportions
 
 as partners,
 
 and that all were alike exposed to the’ same common danger from which the stock belonging to the defendants was saved, and a proportionable part of the expense incurred by saving it paid by the plaintiffs: and why shall the latter not receive from the former a proportionable part of the expense incurred in saving their portion of the stock from the same common danger?"'
 

 The analogy here suggested is more apparent than real. Partners are bound together by a compact which they' are not at liberty to violate. Here there is no such mutual .bond. The parties are brought together without preconcert or agreement of any kind. While the property remains connected, the owners have a common interest in the enterprise'; but the tie which connects them being purely accidental, and not conventional, may be broken at will at any time by either of the parties.
 

 
 *42
 
 It is difficult to reconcile the decision referred to with that in the case of
 
 Bedford Commercial Insurance Company
 
 v.
 
 Parker
 
 (2 Pick., 1). In that case, the ship, bound to Hew Bedford, struck on a reef of rocks about nine miles from the town, and remained there in a situation of great peril. Her cargo was iron. While she lay upon the rocks, the defendants, who owned the iron, sent men on board and removed and saved a considerable portion of the cargo. The plaintiffs, who were the insurers, commenced their efforts to get the ship off before this iron was removed, but without success. They afterwards contracted with an individual to get the vessel off and take her to the town for a specified sum, which he did, she still having 155 tons of the iron on board. The action was brought to recover the defendants’ proportion of this expense, and the question was, whether any portion of the cargo, and if any, what portion should contribute.
 

 If .the doctrine of the case just considered is sound, if the owners of' the ship and cargo are to be regarded as partners .engaged in a common enterprise, or if a just reciprocity requires that the owners of the property first saved should bear, a portion of the expenses incurred in saving that which remains at risk, then, of course, all the iron in this case, as well that previously saved as that on board when the vessel was got off, should have contributed. But the court held that only the 155 tons on board when the expense was incurred was liable. Parker, Oh. J., said: “ The ship was suffered to be wrecked. The owners of the cargo
 
 had a right
 
 to save as much of it as they could, and ought not to be held to pay, on account of what was saved, any part of the expenses which subsequently occurred.”
 

 This decision, which has been uniformly approved, appears to me to be in strict accordance with the principles upon which the doctrine of general average rests. My conclusion, therefore, is, notwithstanding the case of
 
 Bevan
 
 v.
 
 The United States
 
 Bank, that, if the owner of any portion of the cargo, even after a peril has occurred, and after a series of measures to avert it have been commenced, can succeed in so separating his own
 
 *43
 
 property from the rest that it is no longer in any sense at risk, he cannot be held liable to contribute to the expenses subsequently incurred. ' But in order rightly to apply this rule, it is necessary to ascertain the fall scope of the term “ at risk.” Physical destruction, or direct physical injury to the ship or cargo itself, is not the only risk to which property so situated is exposed. Its value depends, or at least is supposed to depend, in some degree upon the successful prosecution of the voyage. Whatever threatens the voyage, therefore, is a peril to the entire property. Until that is broken up, unless the property claimed to be exempt is hot only separated from the rest, and put in a place of present safety, but entirely disconnected with the enterprise, it must be regarded as still at risk, and liable to contribute. If the voyage is not abandoned, and the property, although separated from the rest and removed from the ship, is still under the control of the master, and liable to be taken again on board for the purpose of being carried to its destined port, the relations of the several owners are in no respect changed. The common interest remains; and whatever is done for the protection of that common interest, must be done at the common expense.
 

 There are "two English cases bearing directly upon this question, to which it may be well to refer. The first is that of
 
 Job
 
 v.
 
 Langton
 
 (6 Ellis and Black., 779). The barque Snowdon with a general cargo, sailed from Liverpool for St. Johns, Newfoundland, on the 20th March, 1855, and ran ashore the same night on the coast of Ireland. It became necessary to discharge the whole of the cargo in order to get the vessel off. After the cargo was discharged and placed in store at Dublin, she was got off at considerable cost, with the aid of a steam tug and by cutting a channel for the purpose. The steam tug did no. work at the ship until after the cargo was landed. The vessel was towed to Liverpool to be repaired. In order not to lose a market at St. Johns, the cargo was forwarded from Dublin by another vessel; but it was stipulated that the case should be decided as if the Snowdon, after being repaired, had herself carried on the cargo. The question in the case was, whether
 
 *44
 
 the cargo should contribute to the expenses of getting the vessel off, as a general average.
 

 Now it is plain, that if the position we have assumed is correct, viz., that so long as the voyage is kept on foot, and is not abandoned, whatever threatens to break it up, the whole cargo is to be considered at risk, whether in a situation to be physically injured by the peril .or not, then of course the expenses of getting the Snowdon off, and towing her to Liverpool, must be regarded as chargeable to general average. The case was put upon this ground by Mr. Blackburn, who argued in support of the. general average claim. He said: “ The argument on the other side assumes, that in order to constitute general average, the whole must be saved
 
 from physical
 
 destruction ; but it is enough, if it be a voluntary extraordinary sacrifice,
 
 to save the
 
 adventure.” He admitted that if the adventure be abandoned,
 
 “
 
 the expenses incurred after the abandonment must be incurred for the articles separately, and cannot be brought into general average.”
 

 But the court held that the cargo was exempt from contribution for the expenses of getting the vessel off. It was conceded by Lord Campbell, in giving his opinion, that the fact that the stranding was. unavoidable, and not voluntary, did not affect the question. He said: “Although the stranding was fortuitous, all the expenses incurred from the misadventure, till all the cargo had been discharged, confessedly constituted general average.” He, nevertheless, held that after the cargo was discharged and put in a place of safety, the subsequent expenses could not be said to be incurred for the joint benefit of the. ship and cargo, inasmuch as the cargo was no longer at risk; thus rejecting the doctrine that a peril to the voyage is necessarily a peril to all the property concerned in it.
 

 He was evidently, I think, led to adopt' this conclusion by the circumstance that the cargo was actually carried to its destination by another ship. For, although he says, “ of course we do not, contrary to the intention of the parties, attach any importance to the fact that the cargo was forwarded in another vessel,” he nevertheless adds: “But in.the absence of any
 
 *45
 
 statement to the contrary,
 
 we might infer
 
 (as the fact turned out to be) that there would be no difficulty in forwarding the cargo by another vessel.” This last sentence furnishes the key to the decision; for no one can suppose that if the cargo had in reality been taken again on board the Snowdon, and carried to St, Johns, and the voyage had thus been actually saved to both ship and cargo, that the court would have refused to allow the expenses of getting the ship off, oh the ground that the cargo might have been forwarded by some other vessel.
 

 What the court would have done in that case, may, I think, be gathered from the" subsequent case of
 
 Moran
 
 v.
 
 Jones
 
 (7 Ellis and Black., 523). The material facts in this case were, that the ship Tribune, chartered for a voyage to Peru and back, sailed from Liverpool on the 7th of July, 1856, and having encountered -a storm, was on the same day forced to anchor near the entrance of that port. To relieve her, the foremast was cut away, but she drove ashore and became fixed upon the bank. On the 9th, assistance was procured from Liverpool, and the furniture of the ship, together with the goods on board, were sent in lighters to Liverpool. On the láth a stream anchor was carried out. The ship was afterwards scuttled, and "a portion of the ballast was thrown overboard, when, being kept free by pumping, she floated. She was then taken in tow by steamers, and taken back to Liverpool, where she was repaired; after which the goods were re-shipped, and she again set sail upon her voyage. The question in the case was» whether the owner of the goods was liable to contribute, by way of general average, to the expenses incurred in getting the ship off after the goods were- safely landed and warehoused. -
 

 The court was now called upon to decide a case where the goods were actually re-shipped and forwarded by the same vessel. Here, as in the previous case of
 
 Job
 
 v.
 
 Langton,
 
 the goods were on shore- and safely stored, and hence the expenses in question could not "have been incurred for their benefit, except in view of their interest in the ultimate prosecution of the voyage. Mr. Blackburn, who was engaged in this as well as the previous case, argued here in opposition to the claim of
 
 *46
 
 general average. He pressed upon the court its decision in the former case, that expenses incurred to save the adventure were not to be considered as incurred for the benefit of goods previously taken on shore, although the voyage had not been abandoned. He said: “ Here the goods were no longer endangered, though the
 
 adventure
 
 was. * * * * The adventure was as much in peril in
 
 Job
 
 v.
 
 Langton
 
 as here.” But the court, notwithstanding this argument, held the goods liable to contribute, putting its decision, however, not upon the ground that the saving of the voyage was to be deemed a benefit to the goods as well as the ship, but upon the ground that the getting the ship off and towing her to Liverpool was a continuous operation, commenced before the goods were removed, and completed afterwards; and that this distinguished the case from that of
 
 Job
 
 v. Langton, in regard to which Lord Campbell says: “In
 
 Job
 
 v.
 
 Langton
 
 we considered that the goods had been saved by a distinct and completed operation, and that afterwards a
 
 new operation
 
 began which could not be properly distinguished from the repairs done to the ship to enable her to pursue her voyage. The steam tug did no work at the ship, and does not appear to have been engaged until after the cargo was landed.”
 

 Now conceding this to be a valid distinction, it is difficult to find any foundation for it in the facts of the case. The goods were removed from the ship, and sent to Liverpool on the 9th of July. It does not appear that any effort was made to get the ship off until the 14th. The stream anchor was then carried out. The scuttling, the pumping, and the employment of the steamers to tow her to Liverpool, were all done afterwards. How, then, it can be said that the measures resorted to for the purpose of getting the vessel off constituted a “new operation,” in the case of
 
 Job
 
 v.
 
 Langton,
 
 and not in this, it is not easy to perceive. Lord Campbell refers to the case of
 
 Bevan
 
 v.
 
 The United States Bank (supra)
 
 as supporting the distinction he takes. That case, however, was not put upon any such ground, but as we have seen, partly upon a principle of reciprocal obligation, and partly upon a supposed analogy to a partnership.
 
 *47
 
 The case of
 
 Moran
 
 v.
 
 Jones
 
 was, I think, rightly decided; but I cannot resist the conclusion' that the idea of a continuous operation, commenced before and completed after the removal of the goods, was resorted to in order to reconcile the decision with that in the previous case of
 
 Job
 
 v.
 
 Langton.
 

 These two English cases have been referred to thus particularly because they involved a principle of some commercial importance, and because they lie directly in our path in coming to a conclusion in the present case. But whatever may be the true interpretation of these cases, I nevertheless hold that although every owner of any portion of a cargo may, if he can, separate his property from the rest and from the whole adventure at anytime, and thus avoid contributing to a subsequent loss; yet that such separation must be complete, and such as to have no community of interest remaining. If the enterprise is not abandoned, and the property, although separated from the rest, is still under the control of the master of the vessel, and liable to be taken again on board for the purpose of prosecuting the voyage, the relations of the several owners are in no respect changed. The common interest remains; and whatever is done for the protection of that common interest should be done at the common expense.
 

 The result of these principles, when applied to the present case, is plain. It turns entirely upon the nature and object of the separation of the specie from the ship Galena and from the residue of the cargo, when it was placed on board of the Danish brig. . I entertain no doubt that such a severance as would have exempted it from all liability to contribute to the subsequent expenses might have been effected by the master of the vessel in the same manner as by the owner himself, had he been- present. The master is the agent and representative of each of the owners in respect to their several shares of the property under his charge, and has the same right which the owners themselves would have to take measures for its preservation.
 

 Hj therefore, the captain of the Galena had put the specie on board the brig, not in any event to be returned to him, but to
 
 *48
 
 be taken by the brig to its own port of destination, and the latter had then been suffered to pursue its course, the specie ' would clearly not have been subject to contribution for any subsequent expenditures to save the Galena. And notwithstanding the brig was employed to attend the Galena to Charleston, if it had been distinctly understood between the two commanders that the specie was committed entirely to the custody of the Danish captain, and was in no event to be restored to the care of the captain of the Galena, it would then also have been exempt.
 

 'But the facts do not warrant this assumption. The case states that “ the specie was put on board the brig because it was safer there, as in ease the fire broke out it might be too late to transfer it from the ship.” The brig was to accompany the Galena to Charleston, and there is nothing from which it can be inferred that it was the intention of the captain of the latter to relinquish his control of the specie. The fact that he reclaimed and took it from the brig as soon as he arrived in Charleston, tends strongly to the opposite inference. It never ceased, therefore, up to that time, to constitute a part of the cargo of the Galena; and if the fire had been previously extinguished, and the voyage resumed, it would, of course, have been again taken on board and carried forward by her.
 

 The case states, that while at Charleston the captain of the Galena determined to abandon the voyage. It follows,'from what has been.said, that up.to that time the specie remained liable to contribute to the general average loss; and so the Supreme Court held.
 

 The appeal taken by the plaintiffs, on the ground that freight should have been included in estimating the general average loss, cannot, I think, be sustained.
 

 The judgment of the Supreme Court should be affirmed..
 

 Dentó, Davies,Weight, Bacon and Welles, Js., concurred.