PACIFIC MAIL STEAMSHIP CO. v. NEW YORK, H. & R. MIN. CO.

SAME v. CALIFORNIA VINTAGE CO.

(Circuit Court of Appeals, Second Circuit. May 27, 1896.)

1. GENERAL AVERAGE—DANGER INCURRED THROUGH VESSEL'S FAULT.
   The fact that the vessel is in fault in creating the danger to avert which the sacrifice is made is no ground for denying the right of contribution, as between the cargo owners, though it prevents the vessel owner from sharing therein. 69 Fed. 414, affirmed.

2. SAME.
   Where a general average loss was incurred through a danger caused by the negligence of the master, and the proceeds of the vessel, in proceedings for limitation of liability, were distributed among the cargo owners, *held* that, on a subsequent adjustment in general average, cargo owners who had filed claims in the limited liability proceedings were entitled, with the others, to the benefit of the adjustment. 69 Fed. 414, affirmed.

3. SAME—GENERAL AVERAGE ACTS.

Where a vessel was stranded upon a reef, and the master jettisoned part of the cargo, then flooded the ship to prevent a total loss from pounding, and afterwards the ship and the cargo remaining in her were salved, *held*, that these measures were not for the benefit of the ship alone, but for the cargo as well, and, hence, that it was a case for general average. 69 Fed. 414, affirmed.

4. SAME—PAYMENT UNDER LIMITED LIABILITY PROCEEDINGS.

Proceeds of the ship, paid to various cargo owners in limited liability proceedings prior to the general average adjustment, are to be taken into account in the adjustment, in the same manner as if such proceeds still remained in the registry; and cargo owners who did not appear in the limited liability proceedings are entitled to receive the same benefit from the proceeds of the ship as those who had proved their claims. 69 Fed. 414, affirmed.

5. SAME.

Where, after a stranding, and before salvage operations were begun, specie was sent back to the port of shipment, and thence sent forward by another vessel of the same line, and delivered to the consignees, *held*, that such a separation was thereby effected from the rest of the adventure that the specie was not bound to contribute to the salvage expenses. 69 Fed. 414, reversed.

Appeal from the District Court of the United States for the Southern District of New York.

Lewis Cass Ledyard, for New York, H. & R. Min. Co.

J. Langdon Ward, for California Vintage Co.

Harrington Putnam, for Pacific Mail Steamship Co., as trustee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. These two appeals are from decrees of the district court for the Southern district of New York, upon libels in personam, brought by the Pacific Mail Steamship Company, as trustee, to recover from the respondents, who were cargo owners, the amount claimed to be due upon general average bonds. See 69 Fed. 414.

The City of Para, a steamship belonging to the libelant, sailed from Aspinwall for New York on May 16, 1888, having on board a large general cargo, valued at $232,561.76. On the next evening, at 10:24 p. m., through the negligence of the master, she stranded upon a reef extending from the southwest corner of Old Providence Island. He forthwith attempted to lighten the ship by throwing some cargo overboard, ineffectually backed the engine, and on the next morning made another unsuccessful attempt to free the vessel from the reef by backing her and heaving upon a hawser and kedge anchor which had been gotten out. The master saw that assistance was necessary, and on May 18th sent a schooner, with an officer, to Aspinwall to notify the owners and obtain help. The steamer began to pound upon the reef, with great danger that she would knock out her stern, and knock holes in her bottom. The master, about noon of that day, let water into the engine room and boiler room, so that she might lie steadily; but it was found that water was leaking into all the compartments, and it was determined to open the valves, and let the ship fill fore and aft. This was done, and the vessel lay thereafter motionless. On May 19th, the Madrid, a small steamer, bound for Aspinwall, appeared, and carried to Aspinwall

some of the passengers and Capt. Dow, the agent of the steamship company, who happened to be on board the City of Para. Upon reaching Aspinwall he chartered the Thames, a steamer which reached the island May 25th, and carried back the remaining passengers, the baggage, the specie and bullion on board, amounting to about $30,000, and some coffee. Sixteen bars of bullion, valued at $21,-895.32, which belonged to the defendant, the New York, Honduras & Rosario Mining Company, were sent from Aspinwall by the steamship company in one of its other steamships to New York, consigned to itself, and were delivered to the mining company June 7th, upon its signing an average bond. The steamship company, on May 23d, contracted in New York with the Merritt Wrecking Company to go to the assistance of the wrecked steamship upon a salvage compensation to be determined, in the case of success, by the parties in interest, but the wrecking company was to receive $5,000 in any event. Its wrecking steamer reached Old Providence Island May 29th, and, after some of the perishable cargo which remained on board the steamship after May 25th had been thrown overboard on account of its unhealthfulness, the efforts of the wrecking company were successful, and the steamer was taken from the reef on June 9th. That portion of the cargo which had been temporarily landed or placed in lighters was replaced in the steamer, and she arrived in New York on June 30th with her remaining cargo on board. The salvage which was paid was $25,000.

The steamship company thereupon filed a libel in the district court to limit its liability to cargo owners to the value of the ship and freight, and such proceedings were had that the value of the steamer, immediately after the accident, was found to be $35,869.84, and the proved claims were found to be about $110,000. The vessel was found to have been stranded by the negligence of the master, and the appraised value was distributed proportionally among the several claimants, so that each received a dividend of about 32.4 per cent. The general average adjustment was then made. The total amount received by the cargo owners from the ship was deducted from the total loss. The average loss was then ascertained by comparing the value of the saved cargo with the loss as thus reduced, and the amount which each owner should pay or receive was ascertained by comparing his actual loss with the original value of his goods. In the settlement, he was charged with what he had received from the ship. The bullion contributed to the expenses of the salvage services which were performed after it had been removed from the vessel. The district court was of opinion that the adjustment of the general average had been made upon correct principles, sustained it, and entered decrees for payment accordingly. The mining company appealed from the decree against it, upon the ground that under the facts no proper subject for general average existed, that the adjustment was not made upon proper principles as to any cargo owner, and that in its especial case it was improperly compelled to contribute to the losses and expenses subsequent to the removal of the bullion.

Its first point is that, the losses and expenses having been occasioned by the fault of the master in negligently permitting the vessel

to be stranded, were not a proper subject for general average. The law of the sea, which first established the doctrine of general average, placed itself upon the equitable principle that those who put the property which they separately owned to the hazards of a common peril should bear proportionally the losses which an innocent owner had endured by the sacrifices of his property in successfully saving the other owners from the common dangers; and therefore it did not allow the owner of the vessel or cargo, who was in fault, and who produced the calamity, by himself or by his agent, to share in the contributions from the other sufferers. "No one can make a claim for general average contribution if the danger to avert which the sacrifice was made has arisen from the fault of the claimant, or of some one for whose acts the claimant has made himself, or is made by law, responsible towards the co-contributors." Lown. Gen. Av. (4th Ed.) 34. The appellant seeks to broaden the principle, and make it assert that no general average can exist if the shipowner or his servants created the danger to relieve from which the sacrifice was made. This proposed enlargement would turn the equities of general average into injustice, for it would compel innocent cargo, which had been sacrificed to cure the consequences of the vessel's fault, to suffer alone, although it had freed the rest of the cargo from peril. It is true that the owner of the vessel cannot claim contribution, and is also liable for indemnity to the cargo which has been sacrificed. But the fact that the vessel was in fault presents no equitable reason for preventing the cargo owner from his right of contribution from the owners of the saved cargo, and gives them no just reason for refusing to contribute. When the calamity which was initiated by the fault of the master is imminent, it is his duty to take measures to overcome his mistake, and, if necessary, he has the power of sacrificing a portion of the cargo to save the residue; but his previous fault does not impair the cargo owner's equitable right to receive compensation, if his sacrifice has saved the property of others.

The doctrine of the appellant is not enforced by a decision either of the English or our own courts. On the contrary, it was condemned by the privy council in Strang v. Scott, 14 App. Cas. 601, a case in which innocent cargo had been sacrificed to save the vessel from perils directly occasioned by the fault of the master. The substance of the privy council's opinion was that the master's negligent navigation afforded no "pretext for depriving the shippers, whose goods were jettisoned, of their claim for a general contribution." Lord Watson, in delivering the opinion said:

"The owners of goods thrown overboard, having been innocent of exposing the Abington and her cargo to the sea peril which necessitated jettison, their equitable claim to be indemnified for the loss of their goods is just as strong as if the peril had been wholly due to the action of the winds and waves."

The decision in The Carron Park, 15 Prob. Div. 203, is to the same effect.

The appellant deemed itself supported in its view by the opinion of learned French text writers who were discussing the question with particular reference to the provisions of the French Code. The German and Danish Commercial Codes and the law of Italy seem to be in harmony with the decision of the English privy council.

The appellant next says that the adjustment was incorrect, because the cargo owners who filed claims in the limited liability proceedings against the proceeds of the steamship are estopped from alleging that their loss was occasioned by a general average act, inasmuch as the two modes of procedure are alleged to be inconsistent with each other. The theory is that the cargo owner, in his claim under the limited liability proceedings, treated his loss as the result of a wrongful act, and that in general average he treated it as the result of a rightful act. The theory takes no cognizance of the fact that the liability of the steamship is for the negligent act of its captain in stranding the vessel, while the liability of the cargo owners is to contribute for the jettisoning of part of the cargo to save vessel and the rest of the cargo. The acts are different, and are of different character. The first act was the negligence which injured; the second was the sacrificial act which attempted to save the cargo.

The appellant next says that no one of the acts of the master or owner was of avail in saving, or was intended to save, the cargo; that the jettison, the flooding, and the salvage services were all for the benefit of the ship; and that the nonperishable cargo was never in danger, but was safe in the hold. It may be regarded as settled that the expense of an act or of a series of acts, or the loss occasioned by such acts, for the benefit of the ship alone, or for the benefit of the cargo alone, is not to be contributed for in general average, but that the acts must be for the common good. The view which the appellant takes of the condition of the cargo when the vessel began to pound is somewhat superficial. Her misfortune was not about to be confined to herself; for, if she continued to pound, not only her stern and her bottom would be broken, but her rescue as a laden ship would be defeated; and her cargo must be taken out piecemeal, and sent to Colon to be transshipped, or sent to New York in rescuing vessels. The ordinary result of this method of saving a cargo in a place remote from the terminus of the voyage is destructive of its pecuniary value; and while, to use an illustration of Mr. Lowndes, if a tight and staunch vessel has touched bottom upon a mud bank in port, where there is no danger of injury to the cargo, the expenses of pulling the vessel off might not be a part of general average, the condition of the cargo in the hold of a steamship bound for New York which is pounding on a coral reef on the corner of an island near South America presents a state of facts which lead to a different result. The effect of the flooding was to protect the ship from most serious injury, and to diminish the expenses of saving the cargo, and the effect of the salvage expenses was to bring both to port with much less pecuniary loss than would have otherwise happened.

The next point which is made by the appellants is that the principle upon which the general average adjustment was made up was incorrect. The method upon which the adjustment was made has been described, and it is claimed to have been improper, because it redistributes the amount paid under the decree in the limited liability proceedings. A distribution under such a decree and a general average adjustment relate to different subjects, and the

amount paid under the decree is properly to be taken into account in general average, because the adjustment is to ascertain the contribution which must be made towards losses. The divided proceeds of the ship diminish the losses, and must be taken into account, as they would have been if they had not been paid out, but were in the registry of the court awaiting payment. It is objected that the cargo owners who did not appear in the limited liability proceedings receive the same benefit from the proceeds of the ship as those who proved their claims. That is true, and rightfully true, because the office of the adjustment is the equalization of losses, and to this end the claimants and nonclaimants, in the limited liability proceedings, must stand upon the same footing. If the theory of the appellant had been adopted, a nondamaged cargo owner who received nothing from the proceeds of the ship would pay more than his share of the average loss, because the dividend which was received by the actual sufferers would have been disregarded. The contention that the ship is to contribute is valueless, because the ship contributed when its full value was paid to the claimants, ceased to be a party in interest, and, as tersely put by the counsel for the appellees, "there is no longer any ship to contribute."

In the adjustment, the mining company was charged with its share of the salvage expenses which occurred after its bullion had been sent to Aspinwall. Its whole general average contribution amounted to $12,220.61, and so much of it as arose from the salvage expenses is especially objected to by the mining company. The question, which is one of practical importance, is, when shall the portion of cargo which is permanently detached from the vessel, and permanently separated from the rest of the cargo, and no longer having benefit from the expenses subsequent to its separation, cease to contribute towards such expenses? The leading case in this country upon this general subject is McAndrews v. Thatcher, 3 Wall. 347. Its decision turned upon a state of facts not analogous to those in this case, but the elaborate discussion of the subject by Mr. Justice Clifford makes the opinion one of marked value. The facts in the case were as follows: The master of a ship stranded near her port of destination, and the agent of the underwriters upon her cargo made proper efforts to get her off. Being unsuccessful, they discharged all the cargo, except an undiscovered portion, sent it to the ship's agents, who delivered it to the consignees upon average bonds. The underwriters of the vessel then sent their agent, who undertook to save the vessel. The master and crew left the ship. After an expenditure of money exceeding the value of the ship and of six weeks' time, she was floated. Upon a suit of the shipowners against the consignees of the cargo for contribution for the salvage expenses, it was held that the cargo saved before the master left should not contribute to subsequent expenses for the benefit of the ship, and that the community of interest between ship and cargo had ceased. The general principle which was sanctioned by the learned judge was that "the liability to general average continues until the property has been completely separated from the rest of the cargo, and from the whole adventure, so as to

leave no community of interest remaining"; but it is admitted that, in practice, close questions will arise as to the completeness of the separation, and whether, after the alleged separation, community of interest still remains.

In attempting to ascertain whether the facts in this case show a sufficient, or only a technical, separation of the bullion from the ship and remaining cargo, it is important to notice the facts which the minds of judges in other courts have regarded as controlling upon the same question. In Nelson v. Belmont, 21 N. Y. 36, the other modern leading case in this country, a vessel on a voyage from New Orleans to Havre, and having a quantity of specie on board, caught on fire in the Gulf Stream and was towed or accompanied by another vessel to Charleston. The specie was put on board this vessel, but was subsequently taken back by the master, and deposited in a bank. The burning vessel was so much injured that she sank after she reached the wharf, and expenses were incurred to enable her to prosecute the voyage. General average contribution was claimed by the master from the owner of the specie. The court of appeals of New York held that the specie was liable, upon the ground that the property was all the time under the control of the master, and liable to be taken on board again for the purpose of being carried to its port of destination, and, those two facts existing, a community of interest remained which bound the specie to the ship. In Insurance Co. v. Parker, 2 Pick. 1, the owners of cargo on board a vessel which was stranded within a few miles of her port of destination saved part of the cargo. Afterwards, the insurers of the ship contracted to pay a specified sum to a wrecker if he saved the vessel. He brought her to the wharf with 155 tons of cargo on board. It was held that this portion was liable to contribute in general average, but that the cargo which was taken from the vessel by the owners before the contract of salvage was made was not liable. In Bevan v. Bank, 4 Whart. 301, specie in a ship stranded in Delaware Bay was landed and sent to Philadelphia, the port of destination, by land, and was delivered to the owners. Eight weeks afterwards the vessel reached Philadelphia, with the rest of the cargo. The supreme court of Pennsylvania held that the owners of the specie were liable to contribute in general average towards the expenses which were incurred after the specie was landed.

The tendency of the English decisions is against what the judges regard as a tendency of the courts of this country in favor of a constructive community of interest between ship and cargo, and, on the contrary, is in favor of a strict adherence to the idea that contribution should cease when common danger has ceased; and they regard danger to the cargo as having ceased when it has been taken ashore to a place of safety. Job v. Langton, 6 El. & Bl. 779; Royal Mail Steam Packet Co. v. English Bank of Rio de Janeiro, 19 Q. B. Div. 362; Walthew v. Mavrojani, L. R. 5 Exch. 116. In the Steam Packet Co. Case, which was one of specie sent ashore, and subsequently sent to the port of destination in another vessel, but by agreement of the parties as if in the same vessel, Grantham, J., summarizes his idea of the English decisions as follows:

"If the cargo sought to be made liable for general average contribution has been, at the time of the loss and expenditure, removed to a place of safety, and is not subject to the particular peril which causes the special loss and expenditure, then such cargo is not liable to general average contribution in respect to such charges."

The decision in Moran v. Jones, 7 El. & Bl. 523, which was made by Lord Campbell, who also decided Job v. Langton, is not in accordance with the strictness of the rule as stated supra, but harmonizes with Nelson v. Belmont. A vessel having stranded near Liverpool, the cargo was taken there in a lighter and warehoused. Subsequently the vessel took the cargo on board and went upon her voyage. Lord Campbell held that the cargo should contribute towards the expenses subsequent to the stranding, upon the ground that the act of putting the goods on board the lighter was one part of a continuous operation of saving vessel and cargo, and that the goods continuously remained in the master's custody and control.

In this case the court evidently supposed that the transaction was about the same as if the goods had been temporarily stored in a lighter near the ship, and that there was no actual separation. It is therefore necessary, without relying upon the English decisions, which declare that they are more strict than those of the courts of the United States, to see whether the separation of bullion and ship had so completely taken place that neither was longer bound to the other, mindful that the dictum of Justice Clifford recognized that cargo, though actually separated from the ship, may still be constructively within it. The 16 bars of bullion were, after the vessel was flooded, and before the salvage services commenced, sent to Aspinwall with other treasure, the passengers, and the mails, and were forthwith sent by the steamship company in another vessel to New York, where they were delivered to the consignees. They were no longer in the custody or control of the master of the City of Para and were no longer constructively on board that vessel, but the adventure, as to them, was at an end, and the separation was permanent. The learned district judge was of opinion that the jettison, the flooding, and the salvage services were a continued series of operations for the preservation of all the interests, and that no separation of interest can be construed to have existed; but the question is whether continuity, so far as the bullion was concerned, was not broken. The bullion was not sent to Aspinwall to save the ship, or in the process of saving the cargo. It was sent for the same reason that the mails were sent there, in order that the most compact and valuable things on board might be immediately placed beyond injury, and beyond the care and anxiety of the master, and they were intentionally sent where he could not control or be responsible for them.

The case is not one of the removal of cargo from a wrecked ship by installments, where each removal is for the benefit of all the interests. In such a case, the first installment is not relieved from its share of the subsequent expenses because the relations of the owners of the cargo to each other and to the ship have not been changed. In this case, the two facts of intentional and permanent separation from the ship, and a separation not for the safety of the

ship or of the rest of the cargo, show that, as to the bullion, there was no continuity of operations, and that the relations of the owner to the rest of the cargo and to the ship had been changed. These facts also make it immaterial who received the bullion at Aspinwall, and sent it to New York. A different state of facts might make the action of the owner of the vessel, in rescuing a valuable part of the cargo, and sending it forward to its destination, of importance; but in this case it is not material whether the steamship company or the owner of the bullion received it at Aspinwall. We are of opinion that the decree should be so modified that the specie or the bullion of the mining company should not contribute to the cost of the salvage operations after May 25th.

The California Vintage Company, an owner of cargo, also, on board the City of Para, is the other appellant from a decree of the district court against it, upon a similar average bond. The two causes, together with others, were tried in the district court at the same time, and upon the same record. The cargo owned by the vintage company consisted of 225 barrels of wine, which were damaged to the amount of $88.07. The barrels remained in the ship, and were brought by her to New York. The amount to be contributed by the appellant in general average was found by the district court to be $294.26, with interest and costs. The points which are presented upon this appeal are the same as those in the mining company case, except the one arising from the separation of the bullion from the steamer before salvage operations commenced.

The decree of the district court in the case against the mining company is reversed, with costs of this court, and is remanded to that court, with instructions to enter a decree, with costs against the appellant, in accordance with the foregoing opinion. The decree of the district court in the vintage company case is affirmed, with interest and costs of this court.