THE ST. PAUL.

INTERNATIONAL NAV. CO. v. THE ST. PAUL (CROSSMAN et al., Interveners).

(Circuit Court of Appeals, Second Circuit. April 7, 1898.)

Nos. 91 and 92.

1. SALVAGE—VESSEL AND CARGO—SEPARATE CLAIMS.
Where by one series of operations the cargo is salved, and by another the ship, it is proper for the salvors to bring separate proceedings against. ship and cargo, and for the court to award separate sums, each bearing a different ratio to the amount salved.

2. SAME—ERROR IN VALUATION OF VESSEL.
Where the court valued the vessel salved at $2,000,000, while its actual value was $1,888,500, the error is not material, as, where the total amount salved is· so large, the difference between the two sums is too small to affect the amount of award.

8. SAME—COMPENSATION.
An award of $131,012.48 as salvage against the liner St. Paul, valued at $2,000,000, will not be disturbed as excessive, where she was stranded, and called into service the resources of two wrecking companies with equipment, valued at $400,000. The salvors responded promptly, enabling them to take advantage of the favorable condition of the water on the day she grounded; and the services were rendered by a large force, and occupied 11 days, during which time the liner was exposed to risk of loss.

4. SAME—UNLADING AND DELIVERY OF CARGO—LIGHTERAGE OR SALVAGE.
Where the operations of the salvors in righting and securing a stranded vessel save the cargo, valued at $2,000,000, from a risk to which it was fairly exposed, and the cargo is then removed by them, the award should be for salvage, and not merely the cost of lighterage, and one of $28,987.52, though most liberal, will not be disturbed on appeal.

5. SAME—CHARGE AGAINST SPECIE CARGO.
No distinction can be made between the proportions of salvage charged against the different kinds of cargo, and specie must bear its share of the common burden.

Appeal from the District Court of the United States for the Southern District of New York.

These are two salvage suits growing out of the stranding of the American Line Steamship St. Paul in January and February, 1897. The first action is in rem against the steamer and her freight moneys, and the second is in personam to recover salvage in respect to her cargo. The two actions were tried together in the district court, Southern district of New York, the testimony being given in open court, resulting in salvage awards of $131,012.48 against the vessel and of $28,987.52 against the cargo. The St. Paul, 82 Fed. 104. Appeals have been taken by respondents in both causes, and by libelants in the second one.

Samuel Park and Harrington Putnam, for libelants.
H. Galbraith Ward, for International Nav. Co.
E. L. Baylies, for intervener Van Bergen.
Wilhelmus Mynderse, for intervener Crossman.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. It will be unnecessary to write a long opinion in this case. The district judge has made an elaborate and careful presentation of the facts, as to most of which there is no dispute. The authorities bearing upon the question, "What amount should be awarded as salvage?" will be found in the opinion in The Lamington, handed down herewith, and in the note filed with that opinion. 86 Fed. 675. It will be sufficient briefly to refer to the following points presented on the briefs:

1. The argument has taken a scope far beyond the limits of discussion warranted by these appeals. The libels were filed by salvors to obtain an award for their service. That service was begun when ship and cargo were ashore on the Jersey coast. Before it had proceeded four days the salvors removed the cargo, and subsequently continued their operations on the ship for a week more. The actual services which they rendered to the cargo after they took it from the ship's tackles were materially different from the service they subsequently rendered to the ship itself. When the question of a salvor's remuneration is to be determined, it is eminently proper to inquire exactly what he has done, and to regulate such remuneration accordingly. The cases are numerous where one rate of award has been given on the proceeds of the ship and another and different one on the proceeds of the cargo. It is sufficient to refer to The City of Worcester, 42 Fed. 916. It was, therefore, quite proper in the case at bar for the salvors to bring separate proceedings against ship and cargo, and for the court to award separate sums, which did not bear the same ratio to the amounts salved. But in so doing it was not necessary to decide, and we do not understand that the district court did decide, whether the community of interest between ship and cargo ended, or when it ended, or to what extent the expense of getting the ship afloat was a common charge, or what should be the measure of contribution as between ship and cargo to any expenses whatever, or, indeed, any of the questions which present themselves when an apportionment of general average is under review, as in the case of L'Amerique, 35 Fed. 835. With none of these questions have the salvors any concern. By one series of operations they have salved the cargo, by another series of operations they have salved the ship. Their libels demand the rewards for these services, and the district court, as its decrees plainly show, has decided only that libelants are entitled to recover as salvage $131,012.48 against the ship and freight and $28,987.52 against the cargo.

2. It is contended that the district judge erred in valuing the St. Paul at $2,000,000. It was stipulated in the proceeding against the ship that her value should be taken at $1,500,000. Subsequently this stipulation seems to have been waived, and testimony was taken bearing on the question of her value. It appeared that the St. Paul, which was built in this country, had been completed but a few months, and that she cost $2,650,000. The president of the International Navigation Company (her owner) testified that this was 30 per cent. more than she could be built for in England. She was so new that a proper valuation would be her fair cost, and, if the $2,650,000 represents the cost of building such a ship and 30 per cent. on such cost, then such cost would be 130 : 100 : : $2,650,000 : (in round numbers)

$2,038,500. From this should, however, be deducted the depreciation caused by her stranding, which would be fairly represented by what it cost to repair her, viz. $150,000. This would leave $1,888,500. When the total amount salved is so large, the difference between this sum and $2,000,000 is too small to affect the amount of award for salvage.

3. It is contended that too large an award was made for salvage, and it is suggested that it is the largest reported in the books, except The Thetis, 3 Hagg. Adm. 14. The value of the property salved, however, was very greatly in excess of any reported in the books, and, while it is true that the percentage of award diminishes as the amount salved increases, no case can be found which does not sustain the proposition that the amount salved is an important element to be considered in determining the amount to be awarded. Reference is made to L'Amerique, 2 Asp. 460, where an award of £30,000 was reduced on appeal to £18,000. The services in that case were not especially meritorious. Salvors (their vessels being worth $200,000) fell in with a steamship which had been abandoned in a panic. There was considerable water in her, but it did not come from any leak, and she was in no danger of sinking. Salvors towed her about 100 miles to port, and their services, as the court found, "fall very far short of services which in other cases have been remunerated by much smaller sums." But in the case even of L'Amerique, the value of the salved property was only £190,000, so that the reduced award was over 9 per cent. Here there is an award against ship and freight, valued at $2,000,000 of $131,012, about 6½ per cent. It is unnecessary to rehearse the facts which induced the fixing of the award at that sum. They are fully set forth in the opinion of the district judge. Whatever force there may be in some of the minor criticisms as to his findings, they are on all material points abundantly sustained by the evidence. The appellant contends that the district court was in error in its conclusions as to the difficulty of getting the vessel off, and as to the degree of danger to which she was exposed while she remained aground. Undoubtedly, it is apparent that all the tugs which could be made fast to her could not have pulled her off, and that it needed a heaping up of the water under an easterly wind to make such movement possible. So, too, if the St. Paul had procured the necessary cables, and bent them to her own heavy anchors, and planted those anchors just where the wrecker's anchors were planted, and had hired tugs, and pulled and hauled under the same conditions and at the same time, she would have accomplished the same result. But she did none of those things. She promptly called for the salvor's aid on the usual salvage terms, "No cure, no pay," and it may reasonably be supposed that her owners and underwriters felt much more comfortable in their minds when they knew that the resources of two fully equipped wrecking companies (the equipment in service was worth $400,000) were engaged in the operation, directed by the skill acquired through long years' experience in conducting just such operations on that very coast. Moreover, the element of promptness characterized the service. The wrecking steamer, fully equipped, was sent through a dense fog to the relief of the St. Paul, running down the coast on a course determined by the casting of the lead. One result of the salvor's promptness was that a favorable condition of the water on the very day she grounded was

availed of, and the ship moved 160 feet. The exertions of the next eight days, in calm weather and smooth sea, moved her only 77 feet. We cannot say, on this record, whether, had it not been for that 160 feet, the moderate easterly breeze and swell of February 4th would have freed her from her bed sufficiently to accomplish removal, or whether she might not have had to wait for some heavier storm, with the chance of meeting the same misadventure as L'Amerique, 35 Fed. 835, breaking her cables and getting still further up on the beach. The appellant, moreover, underrates the danger to which the St. Paul was exposed. There was, of course, no "imminent danger," possibly no remote danger, of her breaking up. She had made a bed for herself in the sand, her keel resting on a substratum of tough clay, and, so far as the proof shows, although there were rocks near her, there were none under her. The water was likely to cut out the sand at one place and heap it up at another; but, although that would subject the ship to unequal strain, it may be that she was too strongly built to break her back, so long as her keel rested on the clay. But even if, as appellant contends, she might have remained there in safety for an indefinite time, we cannot accede to the proposition that she was not thereby exposed to risk of loss. Granted that the structure would remain intact high up on the beach, an object of interest to curiosity seekers in calm weather, and that she was so strongly built that, lying nearly broadside to the Atlantic, she would withstand the buffeting of the seas sent in by an easterly gale, and remain intact, a monument to the thoroughness and conscientiousness of American shipwrights, nevertheless she was not built or bought for any such purpose. While she lay on the Jersey beach she was making nothing for her owners, either in money or reputation, but quite the reverse, and her value as an ocean liner was certainly exposed to great risk of deterioration. In the 11 days she lay there the strains to which she was exposed produced such a condition of affairs that it cost $100,000 for repairs to her hull. It is entirely unreasonable to insist that continued exposure would not have seriously increased this charge. We find nothing in the record or in the arguments of counsel which would require this court to disturb the award of $131,012.48 as salvage against the ship.

4. The cargo salved was worth about $2,000,000. The award, $28,-987.52, is about 1.45 per cent. It was at once determined to lighten the steamer by removing the cargo, and that operation began on Sunday,—the day after she stranded,—being completed by the Wednesday ensuing. Respondents contend that allowance should be made only of the cost of lighterage at schedule rates of libelants and their actual expenditures,—something less than $3,000. We are unable to assent to this proposition. The cargo was on board the ship, and exposed to its risks, when the salvors took hold; and remained on board during the operations which resulted in placing the anchors where they proved effectual, and in moving the vessel 160 feet. Salved property pays not only for avoidance of the certainty of future mishap, but for avoidance of the risk of such mishap. Calm weather and smooth seas facilitated the work, and, by reducing the element of actual service rendered, reduced the award, but the anchors and cables which the salvors laid down saved the cargo from a risk to which it was fairly exposed; not, indeed of total loss, but of increased cost of

lightering and forwarding, since a slight change in the position of the ship might have so reduced the depth of water alongside as to make the discharge and forwarding of the cargo a much more expensive operation. The award of the district court has undoubtedly been most liberal. If the matter were before us as a court of first instance, we might be inclined to fix the awards against the cargo at 1 per cent.; but, as it is, we do not feel warranted in reversing the decree when the percentage of difference is so small.

5. About $1,000,000 of the cargo was gold, contained in 21 kegs. The interveners to whom it was consigned insist that salvors should recover only $100, because the gold was conveniently stowed, easily handled, its discharge into the lighter occupying only one hour, and because it paid a high rate of freight. No authority is cited in support of this proposition, except the dictum of Dr. Lushington in The Emma (1844) 2 W. Rob. Adm. 315. The weight of authority, however, is decidedly against differentiating the awards against different kinds of cargo, or relieving specie from bearing its share of the common burden when it is not removed to a place of safety before salving operations are begun. Nelson v. Belmont 21 N. Y. 36; McAndrews v. Thatcher, 3 Wall. 347; Coast Wrecking Co. v. Phœnix Ins. Co., 13 Fed. 127; Pacific Mail S. S. Co. v. New York H. & R. Min. Co., 20 C. C. A. 349, 74 Fed. 564; The Longford, 4 Asp. 385.

The decrees of the district court are affirmed, with interest and costs in the first suit, and with neither interest nor costs in the second, both sides having appealed.